THOMAS F. REDLIN *et al.*, Plaintiffs-Appellees, v. THE VILLAGE OF HANOVER PARK, Defendant-Appellant.

First District (1st Division)   No. 1—94—1313

Opinion filed February 13, 1996.

184

Pretzel & Stouffer, Chtd., of Chicago (Robert Marc Chemers and Daniel G. Wills, of counsel), and Knight, Hoppe, Fanning & Knight, Ltd., of Des Plaines (Byron D. Knight and John J. Kohnke, of counsel), for appellant.

Anesi, Ozmon & Rodin, Ltd., of Chicago (Mark Novak, Darius H. Bozorgi, and Scott H. Rudin, of counsel), for appellees.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, the circuit court of Cook County entered judgment on a verdict in favor of plaintiffs Thomas and Kathy Redlin and against the defendant Village of Hanover Park (Village) in a personal injury action. The Village appeals.

The record on appeal indicates the following facts. On July 19, 1990, plaintiffs filed a two-count complaint against the Village pursuant to section 13—217 of the Illinois Code of Civil Procedure (735 ILCS 5/13—217 (West 1992)). Count I of the complaint alleged that Thomas was injured on May 7, 1988, when the motorcycle he was driving collided with a curbed concrete abutment in the center of Greenbrook Boulevard, just west of Barrington Road in the Village. The complaint alleged that this collision was caused by the negligent failure of the Village to maintain or replace a sign which had previously been erected to warn motorists of the abutment, but which had allegedly been knocked down prior to May 7, 1988. The complaint further alleged that the Village had been negligent in inspecting the location so as to determine that the sign had been knocked down. Count II of the complaint pleaded Kathy's loss of consortium resulting from the collision.

The following facts were adduced at trial. On the afternoon of May 7, 1988, plaintiffs took their three-year-old son to a barbecue at the home of Mike and Anne Peters, which was located in the Village. Thomas and Mike Peters were friends, had previously worked for the same company and had been roommates in the early 1980's. The Peters' two children also attended the barbecue, as did Anne's friend, Lisa Ryan, and Lisa's boyfriend, Gary Babiarz. The plaintiffs had purchased a six-pack of beer on the way to the barbecue.

The plaintiffs arrived between 1 and 2 p.m.; on the date in question, Thomas was "on-call" as a heating, ventilation and air conditioning repairman. Thomas testified that he thought he drank two beers between 1 and 2 p.m. Dinner was served sometime between 6 and 7 p.m. Thomas testified that he had soda with his meal. Lisa Ryan, Gary Babiarz, Mike Peters and Kathy Redlin testified that Thomas did not appear to be under the influence or impaired at the barbecue.

After the dinner, Thomas asked to take Mike's motorcycle to get a pack of cigarettes. Thomas testified that while he had driven motorcycles in the past and felt comfortable with Mike's motorcycle, he had never been licensed to drive one. Mike testified that he let Thomas take the motorcycle, but would not have done so if he had thought Thomas was impaired or inexperienced. Gary Babiarz testified that he did not see Thomas have any difficulty with the motorcycle as it pulled away from the Peters home. The weather was clear and dry.

Thomas drove the motorcycle to a gasoline station at the corner of Lake and Greenbrook, where he bought a pack of cigarettes. Afterwards, Thomas decided to take the motorcycle for a ride and did not retrace his route to the Peters home. Thomas drove eastward on

Greenbrook; he was unfamiliar with this stretch of road. At this point, Thomas had not experienced any problems with the operation of the motorcycle. Thomas testified that he was moving at between 25 and 30 miles per hour, close to the center of the road, but still on the correct side of the road.

The road progressed on an incline. As Thomas travelled along the crest of the incline, he had difficulty seeing the road ahead. Thomas glanced down and switched to the motorcycle's high-beam headlight. Approximately one second later, Thomas saw a curb between three and five feet in front of him. Thomas testified that he attempted to brake, but struck the curb. Thomas was thrown from the motorcycle, landing in the eastbound lane of Greenbrook Boulevard. Thomas crawled to the side of the road and waited until help arrived.

An ambulance took Thomas to Humana Hospital in Hoffman Estates. Thomas was later transferred to the spinal cord intensive care unit at Northwestern Memorial Hospital, where he underwent spinal surgery and was told he would be paralyzed from the waist down.

Dr. James O'Donnell, a pharmacologist, pharmacist and nutritionist, testified as an expert for the Village. Based on his review of the relevant medical records, ambulance reports, police reports and Thomas' deposition, Dr. O'Donnell opined that at the time of the collision, Thomas was under the influence of alcohol, which impaired his ability to think and act with ordinary care. According to Dr. O'Donnell, Thomas' response time, depth perception, peripheral vision and ability to discern signs and signals would have been affected. Dr. O'Donnell also opined that the statements of persons who observed Thomas would not change his opinion because the effect of the alcohol would be primarily internal at the levels detected in this case.

For example, Dr. O'Donnell testified that a blood-alcohol test performed at Humana Hospital showed that Thomas' blood was drawn at 10:15 p.m. and showed a blood-alcohol level of .067. Dr. O'Donnell testified that it is possible to extrapolate from this number the blood-alcohol level that would have been present at times prior to the blood test. According to Dr. O'Donnell, a blood-alcohol level of .067 at 10:15 p.m. would translate to a blood-alcohol level of .085 at the time of the collision, which Dr. O'Donnell estimated as 9:15 p.m. Dr. O'Donnell testified that a man of Thomas' height and weight would have to drink more than three beers within an hour of the collision to have a .085 blood-alcohol level. Alternatively, assuming that the drinking occurred before 3 p.m., Dr. O'Donnell opined that a man of Thomas' height and weight would have to drink more than 9 or 10 beers to have a .085 blood-alcohol level at 9:15 p.m.

Dr. O'Donnell was cross-examined regarding a second blood-alcohol test taken at Northwestern Memorial Hospital at 12:35 a.m. on May 8, 1988, which showed a blood-alcohol level of zero. Dr. O'Donnell testified that the extrapolation formula would suggest that if Thomas had a .067 blood-alcohol level at 10:15 p.m., he would have a blood-alcohol level between .031 and .022 when the second blood sample was drawn. Dr. O'Donnell stated that Thomas would have to have a superhuman rate of metabolism for a blood-alcohol level of .067 at 10:15 p.m. to reach zero by 12:35 a.m.

Dr. O'Donnell testified on direct examination that he reviewed materials describing the calibration of the blood-alcohol testing equipment at Humana Hospital and the guidelines for proper use of that equipment. On cross-examination, Dr. O'Donnell stated that he had no independent knowledge of whether these calibrations and guidelines were followed on the date in question. Dr. O'Donnell also testified that he did not know about the specifics of the test performed at Northwestern Memorial Hospital. In addition, Dr. O'Donnell testified that the test at Humana was performed on blood serum and that the number would therefore be greater than if the test had been performed on whole blood.

Joseph Atkinson testified that he had been director of public works for the Village since 1985. Atkinson testified that one of his responsibilities was to make sure that roadways in the Village were properly maintained. Atkinson stated that the Village was responsible for maintaining a "Keep Right" sign that was supposed to be installed in the median on Greenbrook Boulevard west of Barrington Road. According to Atkinson, the purpose of the sign was to channel traffic to the right of the median strip.

Atkinson testified about the procedure used by the Village for replacing downed or missing signs. Atkinson stated that there is paperwork that reflects every request for a sign to be reerected and every time a sign is reerected in the Village. Over the sidebar objection of the Village, plaintiffs were permitted to use plaintiffs' exhibits 16 and 17, which were photographic enlargements of a "service request" and a "sign work sheet," as examples of the sort of paperwork Atkinson mentioned. Plaintiffs' exhibit 16 indicated that the sign at issue was replaced on June 26, 1987. Plaintiffs' exhibit 17 indicated that the sign was replaced again on February 23, 1988. These exhibits were not included in the record on appeal; however, a transcript of proceedings on a motion *in limine* contains statements of plaintiffs' counsel and defense counsel indicating that plaintiffs' exhibit 17 included the entry "Hit by car; sign replaced." According to Atkinson, a sign will typically be replaced by the Village within a week of receiving a report.

Patricia Ryan testified that she struck the median in question at approximately 8:30 p.m. on March 1, 1988, while travelling eastward on Greenbrook Boulevard. Patricia Ryan testified that there was a bent-downward sign pole that was broken off and rusted at the head of the median strip. Patricia Ryan testified that the pole appeared similar to plaintiffs' exhibit 3, a photograph depicting the sign pole as it existed after the collision at issue in this case. On cross-examination, Patricia Ryan testified that she did not mention the sign or lack thereof to the police at the time of the accident and said nothing about it until she was contacted by plaintiffs' counsel approximately two years later. Hanover Park police officer Brian Roper, who investigated the accident involving Patricia Ryan, testified that the "Keep Right" sign was present at that time. Officer Roper added that he could not recall that the sign was ever missing.

Hanover Park police officer Paul Schaetzle testified that he was the officer who arrived on the scene of the collision at issue at 9:20 p.m. on May 7, 1988. Officer Schaetzle testified that he was familiar with the area and had noticed that the "Keep Right" sign at issue had not been posted on several occasions in the months prior to the collision. During his investigation of the collision, Officer Schaetzle noted that the sign was not present or lying around the vicinity. Mike Peters and Raymond Kuzelka, who lived in Mike Peters' neighborhood, both testified that they had not seen the sign in question for two months prior to the collision.

Chris Giambroni, who was eight years old at the time of the collision, testified that he saw a motorcycle hit and bend over the "Keep Right" sign between 7 and 8 p.m. on approximately the date in question. On cross-examination, Chris admitted that he had testified in a deposition that the accident he witnessed occurred in the winter, but stated that he said this because there was a little frost on the ground. Plaintiffs' counsel also read a portion of the deposition where Chris stated there was a little snow on the ground. Chris Giambroni's mother testified that the accident Chris witnessed occurred in late spring of 1988.

Andrew Ramisch, a civil engineer specializing in traffic and highway safety, gave expert testimony on behalf of the plaintiffs. However, immediately prior to this testimony, plaintiffs' counsel read a stipulation that the Village had no duty to install streetlights or any other illumination for the median strip at issue. It was further stipulated that the Village had no duty to provide cross-hatch painting, hash marks, reflective painting, or raised bumps on or near the median strip at issue in this case.

Ramisch initially offered a number of general opinions based on

the Manual on Uniform Traffic Control Devices for Streets and Highways. For example, Ramisch opined over a defense objection that traffic islands and the proper channels of traffic around them should be made clearly visible at night by adequate reflectorization or illumination or both. Ramisch also opined that signs are supposed to be "retro-reflective," which means that light comes back to the driver. Ramisch further opined that the noses of traffic islands in the line of traffic should be designated by an appropriate sign or marker. Ramisch opined over a defense objection that pavement markers and delineators should be provided to furnish an uninterrupted guidance system.

Ramisch then offered a number of specific opinions regarding this case. Ramisch opined that the Village did not properly maintain the "Keep Right" sign that had been posted at the median strip at issue. Ramisch opined that the sign should have been replaced within a couple of days of receiving a report. Ramisch noted that Village employees travelled the area several times a week and opined that they should have noticed that the sign was missing.

Ramisch testified that the grade and curve of the road were factors in the formulation of his opinions. Ramisch also attached significance to the fact that Thomas had stated in his deposition that he did not recall seeing any dashed lines on the roadway as he proceeded eastward on Greenbrook Boulevard, because such testimony indicated that the dashed line was faded or not properly maintained. Ramisch further opined that the markings leading up to the median at issue and the maintenance of those markings were inadequate.

Following jury instructions and closing arguments, the jury returned a verdict for the plaintiff Thomas Redlin in the amount of $7,500,000, which was reduced by 10% to $6,750,000 due to Thomas' comparative negligence. The jury also awarded $15,000 to Kathy Redlin on her claim of loss of consortium. The trial court entered judgment on the verdict on November 24, 1993. The Village timely filed a post-trial motion, which was denied on April 7, 1994. The Village then filed a timely notice of appeal to this court.

## I

■ The Village initially contends that it was entitled to a judgment notwithstanding the verdict. A judgment *n.o.v.* is properly entered in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In ruling on a motion for a judgment *n.o.v.*,

a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the non-movant. *Maple v. Gustafson* (1992), 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512.

◼ In this case, the Village claims that it is entitled to a judgment *n.o.v.* because it owed no duty to Thomas Redlin. In an action for negligence, the plaintiff must set out sufficient facts to establish that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused injury to the plaintiff. (*Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 592 N.E.2d 1098.) The existence of a duty of care must be determined by the court as a matter of law; absent a showing from which the court can infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law. (*Schoenbeck v. Du Page Water Comm'n* (1993), 240 Ill. App. 3d 1045, 1047-48, 607 N.E.2d 693, 695.) A judgment *n.o.v.* is required when the court concludes from the record that the defendant had no duty to the plaintiff. See, *e.g., Fris v. Personal Products Co.* (1994), 255 Ill. App. 3d 916, 627 N.E.2d 1265 (directed verdict).

◼ The Village bases its argument on section 3—102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act), which provides in part that the Village

> "has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom [the Village] intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used." (Ill. Rev. Stat. 1985, ch. 85, par. 3—102(a).)

The Village maintains that Thomas was not an intended and permitted user of the road because he was not licensed to drive a motorcycle and drove that motorcycle while under the influence of alcohol. Accordingly, the Village concludes that it owed no duty to Thomas regarding the maintenance of the "Keep Right" sign.

This issue is controlled by *Wagner v. City of Chicago* (1995), 166 Ill. 2d 144, 651 N.E.2d 1120, in which our supreme court held that

> "under section 3—102(a) of the Act, the city has a duty to maintain its property in a reasonably safe condition so that a person acting with ordinary care will not be injured. If the city maintains its property in such a condition, it has breached no duty and a negligent plaintiff injured on the property has no cause of action. The city has no duty to foresee and prevent injuries due solely to plaintiff's own negligence. It also is not an insurer for the

safety of the traveling public. However, if the city breaches this duty, even a negligent plaintiff may recover to the extent permitted under principles of comparative negligence." (*Wagner*, 166 Ill. 2d at 153, 651 N.E.2d at 1124.)

The *Wagner* court also decided that the plaintiff in that case was an intended and permitted user of the road, despite the fact that the plaintiff motorcyclist had been speeding and had run a red light. (See *Wagner*, 166 Ill. 2d at 153-55, 651 N.E.2d at 1124-25.) The *Wagner* court stated that "the use which plaintiff made of the road is not prohibited." (*Wagner*, 166 Ill. 2d at 154, 651 N.E.2d at 1125.) The *Wagner* opinion clearly dictates that the focus of our analysis of section 3—102(a) is whether the use of the road is an intended and permitted use, given the broadest definition possible, which is for "travel." (See *Wagner*, 166 Ill. 2d at 153-55, 651 N.E.2d at 1124-25.) Following *Wagner*, Thomas' claim is not barred by section 3—102(a) of the Tort Immunity Act.

The Village argues that *Wagner* is distinguished by the fact that Thomas was *unlicensed*, which makes him a prohibited user of the road. At oral argument, the Village compared Thomas to a pedestrian using the street outside a crosswalk. On the same day *Wagner* was decided, the supreme court decided *Vaughn v. City of West Frankfort* (1995), 166 Ill. 2d 155, 651 N.E.2d 1115, which reaffirmed that pedestrians are generally not considered to be intended or permitted users of the street outside of crosswalks. (See *Vaughn*, 166 Ill. 2d at 158, 651 N.E.2d at 1117.) However, even *Vaughn* reiterates that the focus should be on the use of the street and notes that the streets are marked for use by vehicles. (See *Vaughn*, 166 Ill. 2d at 160-61, 651 N.E.2d at 1117-18.) Consequently, we must conclude that *Wagner* is controlling here.

## II

The Village next contends that the trial court made errors that entitle the Village to a new trial. The Village is entitled to a trial free from prejudicial errors that unduly affect the outcome of the trial. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 139, 254 N.E.2d 453, 457.) Thus, we now address the Village's arguments in turn, as well as their cumulative effect, if any.

## A

The Village contends that the trial court erred in refusing the Village's proffered special interrogatory asking the jury whether it found that Thomas was under the influence at the time of the collision. The Village also contends that the trial court erred in refusing the Village's proffered instruction providing that a person is prohibited from driving under the influence.

A special interrogatory must be submitted to the jury if it goes to an ultimate issue of fact and is proper in form. (*Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 411, 429 N.E.2d 1242, 1252.) However, the Village argues that its special interrogatory went to an ultimate issue of fact because it believes that it owed no duty to Thomas if he was under the influence. This premise is false because *Wagner* is controlling.

It is reversible error to refuse an instruction supported by evidence where that refusal deprives the party who proffered the instruction of a fair and impartial trial. (*Brown v. G&M Distributors, Inc.* (1984), 122 Ill. App. 3d 435, 437, 461 N.E.2d 95, 97.) In this case, however, the record indicates that the jury was instructed that whether a person was under the influence of alcohol at the time is a proper question for the jury to consider in determining whether that person was contributorily negligent. The jury was also instructed that a person who was under the influence of alcohol is held to the same standard of care as a sober person. Given this record, the refusal of the Village's instruction did not deprive the Village of a fair and impartial trial.

## B

■ The Village contends that the trial court erred in allowing evidence about public improvements, such as the illumination of the area or markings near the median strip, where the Village had no duty to provide such improvements. It is clear that the Village's duty to maintain its property does not extend to the creation or erection of a public improvement. (*West v. Kirkham* (1992), 147 Ill. 2d 1, 14, 588 N.E.2d 1104, 1110.) However, the record in this case indicates that the trial court ruled that the testimony would be admissible if there was a stipulation read to the jury to the effect that the Village had no duty to provide those improvements. The record further indicates that such a stipulation was in fact read to the jury prior to Ramisch's testimony. A party cannot stipulate to the introduction of evidence and then complain on appeal its introduction was error. (*Cf. People v. Daniels* (1987), 164 Ill. App. 3d 1055, 1078, 518 N.E.2d 669, 685 (regarding introduction of evidence in criminal case).) Thus, the Village's argument is not persuasive.

## C

■ Finally, the Village contends that the trial court erred in allowing plaintiffs' exhibits 16 and 17, which the Village claims are photographic enlargements of the types of paperwork used by the department of public works that evidenced prior instances where the "Keep Right" sign was replaced. Evidence of prior accidents is only

admissible if it is relevant. (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 758, 449 N.E.2d 942, 945.) The relevance of the details of prior accidents and the foundational requirements for admitting such evidence turn on the purpose for which the evidence is offered. If the evidence is being offered only to show the defendant's notice of the generally hazardous nature of the accident site, then the proponent does not have to establish a foundation showing the similarity between the prior accidents and the present accident. (*Windeguth v. National Super Markets, Inc.* (1990), 201 Ill. App. 3d 35, 38, 558 N.E.2d 548, 550.) On the other hand, if the evidence is being offered to show the existence of a particular danger or hazard, then a foundation must be laid establishing the similarity between the prior accident and the present accident. (*Windeguth*, 201 Ill. App. 3d at 38, 558 N.E.2d at 550.) Departure from these rules constitutes reversible error. *E.g., Henderson*, 114 Ill. App. 3d at 759, 449 N.E.2d at 946.

In this case, the exhibits at issue do not appear to be included in the record on appeal. It is the burden of the Village, as the appellant, to affirmatively show error from the record on appeal. Given the Village's failure to include the disputed exhibits in the record on appeal, we must presume that the trial court did not commit reversible error and conclude that the Village has waived the argument on appeal.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and WOLFSON, JJ., concur.