HARRIS TRUST AND SAVINGS BANK, Guardian of the Estate of John Peter Sartori, a Minor, *et al.*, Plaintiffs-Appellants, v. MARILYN ABRAHAM-ZWIRN *et al.*, Indiv. and as Agents, Servants and Employees of Loyola University of Chicago, d/b/a Loyola University Medical Center, *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—99—1176

Opinion filed June 7, 2000.

---

William J. Harte, Ltd., and Stride, Craddock & Stride, both of Chicago (William J. Harte, Herbert F. Stride, Joan M. Mannix, and Vickie Voukidis Blum, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (Patricia J. Foltz, Marilee Clausing, and Diane I. Jennings, of counsel), for appellees.

JUSTICE WOLFSON delivered the opinion of the court:

In this case the jury was asked to determine how and why a child became severely brain damaged and profoundly mentally retarded. The trial was long and the evidence conflicting. At the end, the jury found the child's estate and his parents did not prove their case against the doctor, nurse, and hospital charged with negligently causing the injuries. The plaintiffs now claim, among other things, the jury was wrong on the facts and a biased juror was allowed to sit. They ask for a new trial. We affirm the judgment in favor of the defendants.

FACTS

The plaintiffs are Harris Trust & Savings Bank, guardian of the estate of John Peter Sartori (John Peter), and Mark and Nancy Sartori (Mark and Nancy), John Peter's parents. The defendants are Dr. Marilyn Abraham-Zwirn (Dr. Abraham-Zwirn), Kimberly Carmignani (Carmignani), and Loyola University Medical Center (Loyola).

On March 9, 1987, Nancy gave birth to John Peter 12 weeks premature. John Peter weighed only two pounds, and he suffered from respiratory distress. He was intubated, placed on a ventilator, and admitted immediately to Loyola's neonatal intensive care unit (NICU).

John Peter was diagnosed with hyaline membrane disease, a condition related to the extreme immaturity of his lungs. Later, he developed bronchopulmonary displasia, a more serious condition which required long-term artificial ventilation. John Peter remained on a ventilator until May 23, 1987.

But on July 8, 1987, John Peter experienced respiratory failure. His attending neonatologist, Dr. Christine Sajous (Dr. Sajous), changed John Peter's medication, hoping to improve his breathing. When this treatment failed, Dr. Sajous suspected John Peter had pneumonia and recommended he return to artificial ventilation. He was reintubated on July 17, 1987, and was placed on antibiotics. When this treatment also failed, Dr. Sajous ordered a tracheotomy. A tracheotomy is a procedure in which a surgeon opens a hole and places a breathing tube in

the patient's trachea through the patient's neck. On July 24, 1987, John Peter received a tracheotomy.

After his surgery, John Peter received 100% supplemental oxygen, but in the NICU his oxygen saturation and carbon dioxide levels fluxuated wildly. Dr. Abraham-Zwirn, the second-year pediatric resident assigned to the NICU on July 24, ordered NICU nurse Carmignani to increase the settings on John Peter's ventilator. These setting increases indicated John Peter's respiratory status was worsening, possibly from fluid collecting in his lungs following surgery. Because John Peter appeared slightly "puffy," Carmignani and Dr. Abraham-Zwirn discussed weighing John Peter to determine whether he had a fluid overload and agreed this procedure required caution because his tracheotomy was so recent. Ultimately, Dr. Abraham-Zwirn ordered Carmignani to weigh John Peter.

After weighing John Peter with help from another nurse, Carmignani placed him in his crib, but noticed his oxygen saturation and heart rate had fallen. Carmignani summoned the charge nurse. At 1:57 a.m. on July 25, 1987, a "Code Blue" was called when John Peter went into cardiopulmonary arrest. Cardiopulmonary resuscitation began.

A respiratory therapist, Kay Mauer, manually ventilated John Peter, while Carmignani performed chest compressions. Dr. Abraham-Zwirn unsuccessfully attempted to replace John Peter's tracheotomy tube three times and unsuccessfully attempted to intubate him once before finally establishing an effective airway at 2:07 a.m. John Peter's oxygen saturation and heart rate finally approached normal levels 13 minutes after they first dropped. Later that morning, Dr. Abraham-Zwirn notified Nancy and Mark about John Peter's cardiopulmonary arrest.

In a September 23, 1987, letter, Dr. Mary Elaine Patrinos (Dr. Patrinos), John Peter's other attending neonatologist, wrote, "Post-op the child was inadvertently decannulated resulting in a primary resp. with subsequent cardiac arrest." Decannulation occurs when a tracheotomy tube shifts from the hole in the trachea, and the patient's airway becomes obscured.

Mark noticed several physical changes in John Peter following his arrest, and a Loyola doctor told Mark that John Peter might be mentally retarded as a result of the incident. John Peter remained in the NICU through September 1987.

As John Peter grew older, the Sartoris learned he had severe brain damage and was profoundly mentally retarded. When John Peter was five years old, the plaintiffs filed a medical malpractice complaint against the defendants. The negligence allegations in the complaint

related to weighing and resuscitating John Peter. The case proceeded to trial.

After a month-long trial, which included testimony from more than 25 witnesses, the jury returned a verdict in favor of the defendants, and the court entered judgment on this verdict on July 17, 1998. The plaintiffs filed a posttrial motion. The court denied this motion on March 9, 1999. This appeal followed.

DECISION

On appeal, the plaintiffs raise five issues. We will address them in turn.

1. Juror Bias

■ The plaintiffs contend the trial court abused its discretion when it denied their motion to discharge a juror for cause.

On June 15, 1998, the parties completed jury selection. But the following day the plaintiffs asked the court to reopen the final venire panel, so they could exercise their final peremptory challenge for a juror they previously had accepted. The court granted the plaintiffs' request, necessitating another round of jury selection to replace the excused juror. The court seated a panel of four venirepersons, which included Cathy Mulroy (Mulroy).

During *voir dire*, Mulroy, an in-house insurance defense attorney, revealed she had used a Loyola doctor as an expert witness "half a dozen [times] or so." The defendants' attorney asked Mulroy, "Is there anything you think either [party] would want to know that would affect your ability to serve as a fair and impartial juror in this case?" She answered, "No." The plaintiffs' attorney then questioned Mulroy about her relationship with Loyola:

> "Q. I know you have told us, and I may want to go into that in a moment, that you do retain or do employ a doctor from Loyola as an expert. But outside of that, do you have any association or relationship with Loyola through friends, relatives, family, anything like that?
>
> A. The medical school?
>
> Q. The hospital, the medical school, the neonatal intensive care unit?
>
> A. Nothing like that."

After Mulroy's repeated assurances she could be fair despite her defense-oriented experience, the plaintiffs' attorney announced he was satisfied "Mullroy [*sic*] will do her best to be a fair and impartial juror." The court placed Mulroy on the jury, and the parties chose two alternate jurors.

The following day, the plaintiffs again asked the court to reopen the final venire panel and excuse Mulroy for cause because she had failed to reveal she had received her undergraduate and law degrees from Loyola University. The court denied the plaintiffs' request, saying: "I would say the school she went to has nothing to do with it." But the court added:

> "I am sorry to say under these circumstances I cannot consider that as a challenge for cause. Your motion is denied. And I really don't like to do that, because we have a plaintiff here who is a defenseless, completely defenseless child. And if I had discretion on this type of situation, I most certainly would have excused this juror on the court's own motion."

We have carefully examined the record of the questions asked of Mulroy before she was sworn in as a juror. The plaintiffs' attorney never asked her what law school she attended. And when he asked her about associations or relationships with Loyola, she responded: "The medical school?" That answer did not trigger the attorney's curiosity about Mulroy's nonmedical connections with Loyola. We find Mulroy truthfully answered each question asked of her. If the plaintiffs' attorney wanted to know more, he should have inquired. We have found no authority for the proposition that a juror must volunteer information not requested.

During the trial, the plaintiffs renewed their request to dismiss Mulroy for cause, noting, among other things, Mulroy had made a facetious comment to another juror. This comment came after the defendants' attorney asked the plaintiffs' nursing expert if Carmignani had written an incorrect weight on John Peter's chart "by accident." When the plaintiffs' attorney objected to the characterization "by accident," Mulroy allegedly said, "No, she did it on purpose." The court questioned Mulroy about the allegations in the plaintiffs' motion. Mulroy admitted she made the comment to another juror but denied the comment was advocacy. The court dismissed Mulroy on the seventh day of trial and placed an alternate on the jury.

We disagree with the court's initial belief it had no discretion to excuse Mulroy for cause.[1] "The trial court has great discretion in determining whether to excuse a prospective juror for cause." *Lambie v. Schneider*, 305 Ill. App. 3d 421, 430, 713 N.E.2d 603 (1999). If the

---

[1]Apparently, the court corrected this initial belief. After dismissing Mulroy, the court reminded the defendants' attorney:

> "You must remember that this Court exercises discretion on these things, on excusing jurors or not excusing jurors ***.
>
> *** I feel that I am exercising sound discretion in relieving her from her Jury duties."

court had serious doubts about Mulroy's impartiality—and was bothered by its decision to keep Mulroy on the jury—the court should have discharged her long before she made her facetious comment. But Mulroy's eventual discharge remedied any error. See *People v. Strange*, 81 Ill. App. 3d 81, 86, 400 N.E.2d 1066 (1980). We note that, after the court discharged Mulroy, the plaintiffs' attorney did not ask for a mistrial. See *Ferman v. Estwing Manufacturing Co.*, 31 Ill. App. 3d 229, 233, 334 N.E.2d 171 (1975). Nor did he ask that other jurors be questioned about Mulroy's conduct. Instead, he proceeded to call his next witness. The plaintiffs' attorney received exactly what he asked for.

The plaintiffs now contend, however, Mulroy's dismissal was not a sufficient remedy, and they assert Mulroy tainted the entire jury. The plaintiffs point to a juror affidavit stating Mulroy explained Illinois Supreme Court Rule 213 objections to the jury. See 166 Ill. 2d R. 213(g). By explaining Rule 213, say the plaintiffs, Mulroy clouded the jury's view of the plaintiffs' experts: "Each time defendants interposed a Rule 213 objection ***, the jury no doubt concluded that the testimony of plaintiffs' experts was newly created for purposes of trial and that plaintiffs' experts were essentially 'making up' their opinions as they went."

Evidence the jury considered extraneous information can impeach the jury's verdict, but only if the losing party first proves the information "relates directly to an issue in the case and may have improperly influenced the verdict." *Pietrzak v. Rush-Presbyterian-St. Luke's Medical Center*, 284 Ill. App. 3d 244, 250, 670 N.E.2d 1254 (1996). "Because the actual effect of the extraneous information on the minds of the jury cannot be proved, the standard to be applied is whether the conduct involved such a probability that prejudice would result that [the trial] is to be deemed inherently lacking in due process." *Macias v. Cincinnati Forte*, 277 Ill. App. 3d 947, 950, 661 N.E.2d 472 (1996).

Here, the plaintiffs cannot show probable prejudice from Mulroy's explanation of Rule 213. The juror affidavit said:

> "The jurors knew that Ms. Mulroy was a practicing trial attorney licensed to practice law in the State of Illinois.
>
> *** While Ms. Mulroy was a juror, and during a break for a sidebar, one of the jurors asked Ms. Mulroy to explain the 213 nondisclosure objections the Defendant's [sic] were making and Ms. Mulroy did so. She explained to us what the rule was."

The affidavit did not describe further Mulroy's jury room "explanation." We do not know the contents of Mulroy's explanation. We do not know whether it was short or long, detailed or simple, right or wrong. And, as the defendants correctly indicate, their Rule 213 objec-

tions were overruled with very few exceptions. We reject the plaintiffs' contention Mulroy somehow misguided the jury.

The plaintiffs also assert "there is a strong inference that there were other private conversations with jurors addressing her views of plaintiffs and explaining the law according to Mulroy." The record, however, contains no evidence to support such inferences, and we reject this contention as well.

2. Manifest Weight of the Evidence

The plaintiffs also contend the jury's verdict was against the manifest weight of the evidence.

We view the jury's findings with deference:

> "A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. [Citations.] Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508 (1992).

■ That is, the trial court should grant a new trial only when the conclusion opposite the verdict is clearly apparent, or the jury's findings are unreasonable, arbitrary, and lack evidentiary support. *Maple*, 151 Ill. 2d at 454; *Black v. Laggren*, 313 Ill. App. 3d 39, 43 (2000); *O'Donnell v. Holy Family Hospital*, 289 Ill. App. 3d 634, 643, 682 N.E.2d 386 (1997). We review this ruling for an abuse of discretion. *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483 (1997).

Because the trial transcript is more than 4,000 pages long, we will summarize only the evidence required for decision.

Carmignani and Dr. Abraham-Zwirn testified about their training and their care for John Peter on July 25, 1987. Carmignani's NICU training at Loyola began with six to eight weeks of classroom and clinical instruction and later included two months of work under the supervision of a preceptor. Dr. Abraham-Zwirn's pediatric residence at Loyola began in 1986. Her first year of training included a month of work in the NICU. During her first year, Dr. Abraham-Zwirn placed 50 to 100 endotracheal tubes, mostly on babies. Her second year included another rotation in the NICU. A month into her second year, John Peter's cardiopulmonary arrest occurred.

Dr. Abraham-Zwirn testified her differential diagnosis of the cause behind John Peter's arrest included an obstruction in the tracheotomy tube, a decannulation, or a bronchospasm. But the bronchospasm di-

agnosis never appeared in John Peter's medical records. Dr. Abraham-Zwirn conceded she considered bronchospasm, not on July 25, but only after reviewing the records: "My opinion today after reviewing all the data and going through it, you know, pretty carefully, I feel that the event that happened that night was a bronchospastic event."

Dr. Craig Anderson (Dr. Anderson), director of the NICU, testified Dr. Abraham-Zwirn was adequately trained and experienced to care for John Peter on July 25. Dr. Anderson added Dr. Abraham-Zwirn's order to weigh John Peter was within the standard of care. Dr. Anderson also testified Carmignani was appropriately trained to care for John Peter.

Dr. John Ness, a Loyola otolaryngology resident, testified he treated John Peter around 2:45 a.m. on July 25. Dr. Ness' progress note said, "Called to see [patient after] accidentally [sic] decannulation [after] weighing. [Patient] noted to be cyanotic [with decreased oxygen] saturation. Peds [service] emergently reintubated endotracheal [with] improvement in oxygenation." But like Dr. Abraham-Zwirn, Dr. Ness concluded after reviewing the incident, "I believe the most likely event that occurred was bronchospasm."

Dr. Sajous testified about John Peter's numerous respiratory illnesses and the treatments he received for them. Dr. Patrinos testified she never noticed any neurological problems in John Peter before July 25, but he manifested neurological defects prior to his discharge in late 1987.

Dr. Steven Coker (Dr. Coker), a Loyola pediatric neurologist, testified neurologic tests performed shortly after John Peter's birth primarily examined the brain stem: "So, a baby could have either extensive injury to the brain or extensive problems with brain formation above the brain stem." According to Dr. Coker, the shrinkage of John Peters' brain shown in an August 9, 1987, CT scan occurred at least four weeks before that test. Dr. Coker concluded the July 25 incident did not cause John Peter's brain damage, and the event which caused the CT scan results occurred prior to July 9.

The Plaintiffs' Experts

The plaintiffs' nursing expert, Catherine King (King), testified Carmignani was not qualified to care for John Peter because she lacked experience with babies fresh from tracheotomy surgery. King also testified Carmignani's conduct in weighing John Peter deviated from the standard of care. King said "accidental decannulation is prevented by not moving the baby for 48 hours" after a tracheotomy. According to King, if a doctor ordered John Peter weighed, two nurses and a respiratory therapist should have moved him to the scale and returned

him to bed. And, customarily, babies with fresh tracheotomy tubes should be manually ventilated during weighing. King offered her opinion of the cause behind John Peter's arrest: "That a decannulation occurred. That the trachea tube came out of the trachea."

The plaintiffs' pediatric otolaryngology expert, Dr. Eugene Flaum (Dr. Flaum), testified Dr. Abraham-Zwirn deviated from the standard of care when she ordered Cargmignani to weigh John Peter. According to Dr. Flaum, weighing John Peter pulled his tracheotomy tube and dislodged it from its proper position. Before John Peter was weighed, he should have been disconnected from the ventilator and manually ventilated. Dr. Flaum said Carmignani deviated from the standard of care when she left John Peter attached to the ventilator while weighing him. Dr. Flaum also testified Dr. Abraham-Zwirn and her Loyola colleagues deviated from the standard of care when they failed to reestablish an airway for John Peter more quickly. Further, Dr. Flaum said Loyola's staffing on July 25 was inadequate.

The plaintiffs' neonatology expert, Dr. Richard Baum (Dr. Baum), also testified John Peter should not have been weighed and agreed John Peter should have been disconnected from the ventilator and manually ventilated before he was weighed. According to Dr. Baum, John Peter's medical and nursing care deviated from the standard of care. Dr. Baum said Carmignani was not appropriately trained or supervised and Dr. Abraham-Zwirn lacked exposure to critical care of neonates. Dr. Baum added Dr. Abraham-Zwirn should have reestablished an airway for John Peter more quickly. Dr. Baum testified John Peter's medical records did not indicate any neurological problems before July 25. Dr. Baum said John Peter's brain damage was a direct result of the July 25 incident, and this injury would not have occurred without negligence.

The plaintiffs' pediatric neurology expert, Dr. Thomas Reiley (Dr. Reiley), testified ultrasound tests taken shortly after John Peter's birth showed no neurological deficits, and no medical records before July 25 show any significant neurological event. According to Dr. Reiley, the August 9 CT scan showed "a generalized loss of brain substance." Dr. Reiley said a "cerebrovascular incident" occurred on July 25, after which "new neurologic findings emerged that had not been present before." Dr. Reiley testified, "Brain damage occurred following—or during the event of July 25th." He concluded: "The decannulation event led to the cardiac arrest, which led to John Peter Sartori's brain having further injury, and the subsequent neurologic condition that he currently has today is explained by that event." But Dr. Reiley acknowledged John Peter was never "absolutely normal neurologically."

The plaintiffs' neuroradiology expert, Dr. Vincent Mathews (Dr. Mathews), testified John Peter's medical records showed no neurological abnormalities before July 25. Dr. Mathews agreed, however, the normal ultrasound tests taken shortly after John Peter's birth had no prognostic value in ruling out later neurologic problems. But, according to Dr. Mathews, the August 9 CT scan showed atrophy and loss of brain tissue related to the July 25 arrest: "[B]ased on the fact they had a normal neurologic exam, had an event, developed an abnormal neurologic event, then had an abnormal imaging study, I believe that there is a relationship between that event and his long term neurologic outcome." Dr. Mathews conceded John Peter may have had some degree of neurologic injury before July 25.

### The Defendants' Experts

The defendants' nursing expert, Linda Grossglauser (Grossglauser), testified Carmignani and the other nurse helping her weigh John Peter did not deviate from the standard of care, and Carmignani did not have to ventilate John Peter manually while weighing him. According to Grossglauser, weighing John Peter did not prompt a decannulation. Grossglauser testified, "given this baby's background and history, I wondered if maybe he was having some bronchospasms." Grossglauser added Carmignani was qualified to care for John Peter.

The defendants' otolaryngology expert, Dr. David Parsons (Dr. Parsons), testified John Peter's arrest most likely was caused by a bronchospasm.

The defendants' neonatology expert, Dr. Michael Schreiber (Dr. Schreiber), testified Dr. Abraham-Zwirn was adequately trained and experienced to care for John Peter on July 25. Dr. Schreiber said neither Dr. Abraham-Zwirn's order to weigh John Peter nor Carmignani's conduct deviated from the standard of care. Dr. Schreiber added the Loyola NICU staff did not deviate from the standard of care in its response to John Peter's arrest. Dr. Schreiber acknowledged none of John Peter's treating doctors noticed any neurological problems before July 25, but Dr. Schreiber reviewed the medical records and concluded:

"I counted up three life-threatening events like the one of July 24th and 25th where he easily could have died at the time.

I counted up ten major events where his heart rate was low and stayed low for a prolonged period of time, as well as his oxygen being low. And then I counted over 180 events where in the chart it says his saturations are down and his heart rate is down."

According to Dr. Schreiber, John Peter's arrest was not caused by a decannulation, but by a bronchospasm. Dr. Schreiber testified John Peter's brain damage was unrelated to his arrest. Regarding causation, Dr. Schreiber said:

"I believe it's multifactorial, that there are many, many problems that this baby had which account for his poor neurological status today.

He was extremely premature. He had severe respiratory distress syndrome. He developed very severe bronchopulmonary dysplasia [*sic*]. *** He had all the complications that are associated [with] the sickest of the sick small prematures."

The defendants' pediatric neurology expert, Dr. John Mantovani (Dr. Mantovani), testified John Peter's brain damage was "absolutely unrelated" to the July 25 event. According to Dr. Mantovani, John Peter's brain injury was not caused by a single incident, but resulted from severe complications of his premature birth:

"What caused his *** brain injury is the prematurity and the severe complications of the prematurity, particularly the cardiac and respiratory problems that he had, the heart and lung problems contributing to blood pressure instability, hypoxia, other abnormalities of his total body, which compromised circulation to his brain.

So, it is the prematurity that caused the brain damage, if you will."

Citing "overwhelming" evidence from John Peter's medical records, Dr. Mantovani added, "I believe that everything about this baby's illness placed him at very high risk of exactly the kind of brain damage that he developed." Dr. Mantovani said John Peter manifested neurological problems before July 25: "[T]o me, the factual evidence says that the damage occurred before that July event." According to Dr. Mantovani, the CT scan showed brain injuries which must have occurred "somewhere in the order of six weeks to a couple of months" before the test, likely between March and May 1987. The July 25 event was not long enough or severe enough to contribute significantly to John Peter's neurological deficits.

The defendants' neuroradiology expert, Dr. Patrick Barnes (Dr. Barnes), testified too little time had passed between the July 25 event and the CT scan for the results of the test to share a causal link with John Peter's arrest. And the 10- to 12-minute July 25 event was too short to cause his brain damage. According to Dr. Barnes, John Peter's brain injury occurred before May 9, 1987.

By necessity, we have not included many of the facts presented to the jury by the plaintiffs. We do not mean to dismiss the importance of those facts. For example, the length of time John Peter was without oxygen on July 25 was a serious issue at trial. Documents generated by Loyola's staff were highly probative. The jury heard the evidence, weighed it, and made its decision.

■ This was a classic battle of the experts. People qualified in their

fields stated their views and gave their reasons. Nothing was said that was not grounded somewhere in the evidence. It happens that the plaintiffs' experts did not agree with the defendants' experts—not an unusual situation as trials go. It was the jury's job to listen to the conflicting evidence and use its best judgment about where the truth could be found. This is what juries do best, and there is no reason to believe it did not do its job in this case. We will not second-guess a jury without a good reason. See *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 940, 652 N.E.2d 1132 (1995). We see none.

### 3. Expert Testimony and Bronchospasm
■ The plaintiffs next contend the trial court abused its discretion in allowing the defendants' experts to testify John Peter's cardiopulmonary arrest was caused by a bronchospasm. The plaintiffs assert the defendants provided no factual support for this testimony.

The trial court has discretion in deciding whether to admit expert testimony. See *Collins v. Roseland Community Hospital*, 219 Ill. App. 3d 766, 774-75, 579 N.E.2d 1105 (1991). "Although opinion witnesses may not base their testimony on conjecture or speculation [citation], they may testify in terms of what 'might or could' have caused the plaintiff's injury." *Hawn v. Fritcher*, 301 Ill. App. 3d 248, 253, 703 N.E.2d 109 (1998); see *Hajian*, 273 Ill. App. 3d at 942 (expert testimony may be based on a reasonable degree of medical certainty).

Here, the defendants presented evidence John Peter had suffered bronchospasms before July 25. Dr. Schreiber was the primary source of that evidence. Against this background, the defendants' experts testified another bronchospasm caused John Peter's July 25 arrest. Because the expert testimony was adequately supported, we cannot say the trial court abused its discretion in admitting this evidence.

### 4. "Notice" Evidence
■ The plaintiffs also contend the trial court abused its discretion in excluding evidence of a 1983 decannulation at Loyola to show Loyola was on notice its staffers were inadequately trained in caring for new tracheotomy patients.

The evidence the plaintiffs sought to introduce involved a different doctor four years before the events of this case, and the source of this evidence was a medical malpractice complaint which never went to trial.

The trial court has discretion in deciding whether to admit evidence. *People v. Childress*, 158 Ill. 2d 275, 296, 633 N.E.2d 635 (1994). Evidence of prior accidents is admissible only if it is relevant. *Redlin v. Village of Hanover Park*, 278 Ill. App. 3d 183, 192-93, 662 N.E.2d

459 (1996). Relevant evidence "has a legitimate tendency to prove or disprove a given proposition that is material as shown by pleadings." *Belshaw v. Hillsboro Hotel, Inc.*, 229 Ill. App. 3d 480, 485, 593 N.E.2d 170 (1992). And the proponent of such evidence must establish a foundation showing the similarity of the prior accident and the accident at issue. *Windeguth v. National Super Markets, Inc.*, 201 Ill. App. 3d 35, 38, 558 N.E.2d 548 (1990).

The plaintiffs assert the trial court excluded this evidence, but the ruling to which they direct our attention is equivocal. The court, after hearing the parties' arguments about this evidence, addressed the plaintiffs' attorney:

> "Look, I think you are off base on that point. I'm not going to rule at this particular time. We will look at your cases that you have attached and so on.
>
> * * *
>
> On that one I am going to rule from the hip. If you want to bring that up at a particular time, we will ask for a side bar, and then I will make a final ruling outside the presence of the jury.
>
> * * *
>
> *** We will decide at that time. My inclination at this time is no, but let's see what you have.
>
> * * *
>
> So far my inclination would be no. Let's look at the law and we will take it up outside of the presence of the jury before we decide."

The plaintiffs do not indicate whether they ever obtained or asked for a final ruling on this evidence. If not, they cannot complain here about a ruling never made. *People v. Waller*, 67 Ill. 2d 381, 386, 367 N.E.2d 1283 (1977).

Ruling or not, because this case involves an injured child, we have examined the 1984 complaint. It refers to the conduct of one doctor, not to that of a nurse. It makes no allegations concerning improper weighing, supervision, resuscitation, or training. The 1984 complaint alleged the Loyola doctor failed to adequately assess labored breath sounds, failed to summon a respiratory specialist, failed to perform blood gas tests, improperly changed the dressing and ties of the tracheotomy tube, and failed to place a larger size tracheotomy tube. The case before us involves none of these allegations. The 1984 complaint is not relevant to the issues in this case, even for notice purposes. If there were some slight relevance, the danger of unfair prejudice—risk of substantive use of the complaint by the jury—would substantially outweigh any probative value the complaint might have for notice purposes.

5. Impeachment

■ Finally, the plaintiffs contend they did not receive a fair trial because the defendants never completed their impeachment of John Peter's father, Mark.

In cross-examining Mark, the defendants' attorney sought to contradict his earlier testimony that he had spoken with respiratory therapist Mauer shortly after the July 25 event. Defense counsel asked Mark to assume Loyola's records showed Mauer did not return to work after the event until August 4 or 5, 1987. Mark balked and noted the difference between the date Mauer returned to work and the date Mauer may have next treated John Peter. Defense counsel acknowledged this difference, saying, "your point is well taken." And later, during Mauer's testimony, the defendants' attorney again acknowledged her error.

When the attorney revealed her mistake to the jury, any alleged error was cured. See *People v. Olinger*, 112 Ill. 2d 324, 341-42, 493 N.E.2d 579 (1986). In addition, the plaintiffs' attorney used defense counsel's error as an offensive weapon during final argument. We do not see the failure to complete impeachment as a serious issue.

## CONCLUSION

The discharge of the allegedly biased juror remedied any error the trial court may have committed by not discharging her sooner, and the juror's legal explanations did not taint the entire jury. The jury's verdict was not against the manifest weight of the evidence. The trial court did not abuse its discretion in its evidentiary rulings. And the incomplete impeachment of John Peter's father did not deprive the plaintiffs of a fair trial. We affirm.

Affirmed.

CAHILL, P.J., and BURKE, J., concur.