2016 IL App (1st) 143045

Fifth Division
June 30, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| JOSEPH JACKSON, | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 13 M1 110673 |
| | ) | |
| MOUNT PISGAH MISSIONARY BAPTIST | ) | The Honorable |
| CHURCH DEACON BOARD and MOUNT PISGAH | ) | Leon Wool, |
| MISSIONARY BAPTIST CHURCH, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises from a dispute between plaintiff Joseph Jackson, a former pastor
with defendant Mount Pisgah Missionary Baptist Church, and defendants over whether
defendants breached the parties' oral agreement when they terminated plaintiff's employment
with the church. Plaintiff entered into an oral agreement with the defendant church and the
defendant board of deacons to be retained as the church's pastor. As part of the oral
agreement, the parties agreed that plaintiff's employment would be governed by the church's
bylaws. Defendants subsequently terminated plaintiff and plaintiff filed a complaint for

breach of contract in the trial court, alleging that defendants breached the parties' oral agreement when they terminated him because they did not follow the procedural steps required by the bylaws for terminating a pastor.

¶ 2 After a bench trial, the trial court found in favor of defendants, concluding that defendants complied with the bylaws when they terminated plaintiff. Plaintiff appeals the trial court's order, arguing that (1) the trial court abused its discretion by excluding certain of his witnesses and (2) the trial court erred in finding that defendants did not violate the bylaws when they terminated him. For the reasons that follow, we affirm the trial court's order.

¶ 3                                    BACKGROUND

¶ 4                                    I. Complaint

¶ 5 On February 15, 2013, plaintiff filed a one-count complaint for breach of contract against defendants; the complaint was amended twice[1] and it is plaintiff's verified second amended complaint on which the parties proceeded to trial. The second amended complaint alleges that plaintiff entered into an oral agreement with the church to be retained as its pastor and to lead the church organization according to the "Church Constitutional By-Laws." The complaint alleges that "[u]nder the terms of the agreement, and for proper and valid consideration, Plaintiff and Defendants promised to abide by the Church by-laws."

¶ 6 The complaint alleges that the board of deacons "attempted to hold a vote of dissatisfaction to remove Plaintiff from his position as Pastor." However, the complaint further alleges that under the bylaws, "there must be a written notice of dissatisfaction from the Church, a Special Meeting of the Deacon Board called and held with the Pastor presiding, proper notice to the congregation membership regarding a special meeting to vote on any

---

[1]The record does not contain a first amended complaint, but only contains the initial complaint and plaintiff's "verified second amended complaint for breach of contract."

dissatisfaction, and a proper membership vote." The complaint alleges that defendants "engaged in none of these procedural steps as required by the By-Laws."

¶ 7     According to the complaint, "[a]fter Plaintiff delivered a signed medical letter identifying his temporary inability to attend certain church meetings, *** Defendants took certain improper illegal actions to have [plaintiff] removed as pastor of the Church." The complaint alleges that defendants moved to have a vote of dissatisfaction, "without proper written notice to the Plaintiff, without any prior special meeting explaining dissatisfaction, and without proper notice to the congregation about when, how and why a special vote was to be taken." Defendants "purported to have a vote on Saturday, December 15, 2012, during a time that [plaintiff] was unavailable, to remove [plaintiff] as pastor of the Church, *** and subsequently discharged Plaintiff and prevented him from performing his duties as pastor."

¶ 8     The complaint set forth one count for breach of contract, alleging that until he was discharged, plaintiff had fully and regularly satisfied his obligations under the oral contract between the parties. However, "[p]laintiff received no prior notice of Letter of Dissatisfaction from Defendants, individually or collectively, regarding his leadership or his performance as pastor of the Church, as required under the Church by-laws and common law." The complaint alleges that plaintiff was not informed in advance of any special meeting called by the board of deacons regarding any dissatisfaction of his leadership, was not informed in advance of any scheduling of a special meeting to hold a vote regarding any dissatisfaction of his leadership, and was not in attendance at any meeting where any vote was held to remove him as pastor of the church. The complaint alleges that defendants' actions breached their contractual duty to abide by the church's bylaws "in order to proceed with any dissatisfaction or change in leadership" and that defendants' "failure to perform the obligations under the

By-Laws of the Church to provide due process in terminating Plaintiff is [the] proximate cause of damages to the Plaintiff[ ] including loss of financial compensation, life and health insurance benefits and damage to Plaintiff's reputation." The complaint alleges that as a result of defendants' breach, "[p]laintiff has been damaged in an amount in excess of $7,500, in addition to court costs and attorneys' fees."

¶ 9        Attached to the complaint was a copy of the church's bylaws, effective August 1, 1995. Part II, section I of the bylaws governs the role of the pastor within the church. Subsection (A) sets forth the selection of the pastor, providing that "[t]he Pastor of this church shall be selected upon recommendation of the Pulpit Committee by *standing vote* of the church membership at the *special meeting* called for that purpose. Public notice of that meeting *shall be announced* to the membership, *from the Pulpit*[,] at least two *(2) Consecutive Sundays* prior to the meeting. The Pastor will be selected by the majority of the membership present [a]t that special meeting." (Emphases in original.)

¶ 10        Subsection (C) sets forth the duties of the pastor and provides, in relevant part:

> "The Pastor does not have the authority to dissolve the Official Staff: Deacons and Trustees. The Church reserves that right with a majority [v]ote of the active membership. *** He may preside in all meetings of the Church and board, deacons and/or trustees, weather [*sic*] for devotion or [b]usiness. He shall promote missions in the church, call regularly upon [t]he sick and needy membership, and be responsible for the administering [o]f the church office. In addition, the Pastor shall be ex-official [*sic*] on all boards and committees of the church."

¶ 11        Subsection (D) sets forth the pastor's term of office and explains the procedure for his termination. It provides, in relevant part:

4

"The term of office is indefinite and can last as long as The Pastor and Church can agree. The Pastor, thus elected, shall serve [u]ntil the relationship is terminated by his request or the church's request. The termination of the Pastor may be effected upon:

1. One month's written notice from the pastor.

2. One month's written notice from the church.

3. [A]fter written notice of dissatisfaction has been given to the pastor, he must respond to a special meeting with the Deacon Board within two (2) weeks.

4. Should the Church desire to dismiss the Pastor, the Chairman of the Deacon Board may call a *special meeting* of the membership for that [p]urpose.

A. A public notice must be given two (2) consecutive Sundays [p]rior to the meeting.

B. Termination shall be based on a majority *standing vote* cast by [t]he members present at that meeting.

5. In the event of termination, the pastor shall be given four (4) weeks severance pay based on his current salary." (Emphases in original.)

¶ 12    Part II, section III of the bylaws governs the role of the deacons within the church, and provides, in relevant part, that "[t]he board shall consist of a Chairman and other members, voted in [b]y the church upon recommendation of the pastor."

¶ 13    Also attached to the complaint was a December 3, 2012, letter from plaintiff's doctor, which stated that plaintiff "suffers from Hypertensive Cardiovascular Disease" and recommended "that he abstain[ ] from different church meetings which are likely to aggravate his clinical condition, for a period of ninety days (3 months)."

¶ 14    Finally, attached to the complaint was a December 17, 2012, letter to plaintiff from Deacon Isaac Walker on behalf of the board of deacons. The letter stated that "[t]he Mt. Pisgah Missionary Baptist Church Deacon Board is writing this letter to inform/confirm you of your termination as Pastor of our Church at [the] *Saturday*, *December 15*, *2012* church meeting. It was decided by the Majority of *(53) to (22) votes* to vacate the Pulpit." (Emphases in original.)

¶ 15    On December 4, 2013, the church filed a motion to dismiss the complaint pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2012)), claiming that civil courts were prohibited from interfering in ecclesiastical controversies involving the termination of clergy. In response, plaintiff argued that the United States Constitution did not prohibit court intervention when a church organization failed to follow procedures it had, itself, enacted. On January 4, 2014, the trial court denied the church's motion to dismiss "based on the Ervin v. Lilydale Progressive case [(*Ervin v. Lilydale Progressive Missionary Baptist Church*, 351 Ill. App. 3d 41 (2004))]" and found that the matter was a contractual issue.

¶ 16                                    II. Discovery

¶ 17    The parties proceeded to engage in discovery, and we relate here only the discovery that is relevant to the issues on appeal. In response to plaintiff's requests to admit, the church admitted that there was no contract signed relating to plaintiff's employment, but that the parties agreed that plaintiff's employment would be subject to the church's constitution and bylaws. The church further admitted that a public notice of a meeting of the membership was placed in the church bulletin for the worship service on Sunday, December 9, 2012, and that a meeting of the membership took place on Saturday, December 15, 2012. In response to

defendants' requests to admit, plaintiff admitted that on Sunday, December 9, 2012, plaintiff was provided with a "Sunday Morning Mention Sheet" that contained announcements to be made to the entire church, and one of the announcements listed was a church meeting scheduled for Saturday, December 15, 2012.

¶ 18       On June 11, 2014, the church served plaintiff with interrogatories, requesting, *inter alia*, the names of any witnesses intended to testify at trial. On June 26, 2014, the trial court ordered that "[a]ll discovery [was] to be completed and closed by July 17, 2014." On July 17, 2014, the matter was set for trial on September 3 and 4, 2014.

¶ 19       On August 22, 2014, the church filed a motion to bar 11 of plaintiff's proposed witnesses, arguing that plaintiff served the church with his witness list on August 21, 2014, when discovery had closed on July 17, 2014, and trial was set for September 3, 2014. The motion claimed that at the time discovery closed, plaintiff had identified only one witness, namely, plaintiff himself, and the church had deposed plaintiff. The motion further claimed that it would be impossible for the church to take any and all of the depositions on plaintiff's list of witnesses in a timely manner, and that it would be prejudiced by permitting plaintiff to use witnesses without the church having an opportunity to depose them. On August 28, 2014, the trial court granted the church's motion to bar plaintiff's witnesses "for the reasons given in open court."[2]

¶ 20       On August 29, 2014, plaintiff filed a motion to reconsider the order barring his witnesses, arguing that the church's July 15, 2014, answers to plaintiff's interrogatories did not contain sufficient information to identify the nature of each witness' testimony. Thus, on July 31, 2014, plaintiff issued a 201(k) letter to the church asking the church to supplement its

---

[2]The record does not contain a transcript of the August 28, 2014, hearing.

answers to the interrogatories, which plaintiff received on August 11, 2014. According to the motion, "[p]laintiff promptly consulted with persons believed to have relevant knowledge of the facts related to the additional subjects on which Defendant witnesses would testify," all of whom were current or former members of the church "and had thus been identified in Plaintiff's interrogatory response."[3] Plaintiff supplemented his response to the church's interrogatories on August 20, 2014, adding additional witnesses to counteract the church's witnesses. Plaintiff's motion to reconsider argued that he could not have known what witnesses he would need in order to rebut the church's witnesses until after the church had adequately provided the information concerning its witnesses and the subjects on which they would testify, which was not done until August 11, 2014.

¶ 21                                          III. Trial

¶ 22        Trial commenced on September 3, 2014. The only witnesses to testify were plaintiff, who testified on his own behalf, and Deacon Isaac Walker, who testified on behalf of the defense.[4]

¶ 23        Plaintiff testified on his own behalf that he began working as the church's pastor in November 1995 and worked there until the end of 2012. Plaintiff testified that on or about December 17, 2012, he received a letter by certified mail from the board of deacons terminating his employment, which was signed by Isaac Walker. Plaintiff further testified

---

[3]A file-stamped copy of plaintiff's response to the church's interrogatories is not contained in the record on appeal. However, an unstamped copy attached to plaintiff's motion to reconsider indicates that, in response to an interrogatory concerning identification of "all persons who have knowledge of any of the facts alleged in this case," plaintiff stated that "members of the Mount Pisgah Missionary Baptist Church in attendance at various meetings as stated in the complaint have knowledge related to those meetings and that Members of the Board of Deacons have knowledge of specific conversations or communication with themselves, members of the congregation or Plaintiff regarding incidents as stated in the Complaint."

[4]Defendants attempted to put on a second witness to testify as to the condition of plaintiff's office after his termination, to show reasons for why he was terminated, but the court sustained the objection to the witness' testimony on the basis of relevance.

that he did not have a written employment contract with the church but had an oral agreement that his relationship with the church would be governed by the church's bylaws.

¶ 24      Plaintiff testified as to his understanding of the requirements for a "letter of dissatisfaction" under the bylaws, testifying that "[m]y understanding is that the church is to authorize the letter of dissatisfaction, which should be done in a church meeting. There would be an offer, motion offered for the letter of dissatisfaction and the church would vote on it. That's how the business was handled." Plaintiff testified that the church would have "business meetings" twice a year and that public notice was provided for these meetings "[o]ver the pulpit by the pastor and also in the church bulletin." The "[o]nly other form" of notice that would be used for public notice of church meetings would be "if the pastor designated someone to stand in his stead" and make the announcement from the pulpit. Plaintiff testified that the pastor was to preside over congregational meetings and further testified that he was never in attendance at any congregational meeting at which a letter of dissatisfaction was voted on, nor did he receive any letter of dissatisfaction.

¶ 25      Plaintiff testified that he attended a meeting of the board of deacons in October 2012, but there was no vote of dissatisfaction at that meeting. Plaintiff admitted that during that meeting, Deacon Charles Bridgeman attempted to give him an envelope, but plaintiff "did not receive that envelope" and did not know what was contained inside. Plaintiff then "told them that I would not receive a sealed envelope, and that if they had issues with me, that was the reason why the meeting was called and we can discuss it now." There was no discussion of any issues at that time.

¶ 26      Plaintiff testified that according to the bylaws, he was *ex officio* over all boards and committees, including the board of deacons. As such, he never attended any board of

9

deacons' meetings in which a motion of dissatisfaction or an authorization to issue a letter of dissatisfaction was voted on, nor did he ever receive notice of any meeting where that would be a topic of discussion.

¶ 27    Plaintiff testified that a meeting of the congregation "could be called by the pastor, or his designee, or in cases where the church had agreed to dismiss the pastor, the chairman of the deacon board was allowed to call a meeting for that purpose." Plaintiff did not call a meeting for December 15, 2012. Plaintiff testified that he preached on December 2, 2012, and was present for the entire church service. He did not make any announcement of a December 15 congregational meeting, nor did anyone else make an announcement of such a meeting in his presence during the worship service. Plaintiff further testified that there was no notice of a meeting placed in the December 2 church bulletin. However, after the December 2 service, plaintiff became aware that there was to be a December 15 congregational meeting when one of the church members called plaintiff and asked him whether he was aware that there was to be a meeting concerning whether to retain plaintiff as the church's pastor.

¶ 28    The following Sunday, December 9, plaintiff "gave notice to the church that I heard of a meeting being called by Deacon Isaac Walker, and that he was not authorized to call such a meeting. And I presented a letter from my doctor to the church asking them to hear the judgment of my doctor, advice of my doctor *** that I should not be in attendance of any such church meetings, because of my elevated blood pressure and clinical condition." Plaintiff testified that the December 9 church bulletin contained an announcement of the December 15 meeting, but did not contain a statement as to the meeting's subject matter.

¶ 29    Plaintiff testified that he did not attend the December 15 meeting because he "advised the church that the meeting was illegally called" and because of his doctor's advice. He learned what had happened at the meeting "[t]hrough the letter that was sent to me."

¶ 30    On cross-examination, plaintiff testified that he visited his doctor on December 3, 2012, after learning of the scheduled December 15 meeting, and admitted that after visiting the doctor, he remained able to perform all of the functions of his position other than attending stressful meetings. Plaintiff denied that the reason that the meetings were stressful was because some members wanted him to resign, but admitted that he had testified in his deposition that the meetings were stressful due to personal attacks, which included members telling him he needed to resign. Plaintiff further admitted that he "went to the doctor on December 3, 2012 to specifically ask the doctor to not have [him] attend stressful meetings."

¶ 31    Plaintiff also admitted on cross-examination that he presided over a congregational meeting on October 20, 2012, in which the members voted to change the bylaws to permit an anonymous vote concerning whether to retain the pastor. However, plaintiff testified that they were "[n]ot necessarily" targeting him specifically, because "[i]t was to change the bylaws so that the vote for the pastor would be by secret ballot. It doesn't matter if it was me or anyone else."

¶ 32    Plaintiff further testified on cross-examination as to the sealed envelope he refused to accept from the deacon on October 29, 2012, testifying that a letter of dissatisfaction could not have been inside the envelope "[b]ecause the church did not authorize it. I was at the church." When asked who represented the church, plaintiff testified that "[t]he pastor represents the church." However, plaintiff admitted that he was unable to sign contracts or write checks on the church's business account. Plaintiff further admitted that he did not meet

with the board of deacons at any time during the two weeks following the October 29, 2012, meeting.

¶ 33    Plaintiff testified that he was given "mention sheets" by the deacon in attendance that contained announcements to be made by the pastor over the pulpit. When he was given a mention sheet, plaintiff would make the announcements listed on the sheets "[i]f I choose to"; plaintiff explained that "I have the authority to decide what is to be announced," with that authority based on "me being the overseer of the church." Plaintiff was provided an exhibit purporting to be a mention sheet dated December 2, 2012, but testified that he did not recall receiving that document and "[t]his document could have been printed after that." Plaintiff was provided another exhibit purporting to be a mention sheet dated December 9, 2012, but did not recall receiving that document. However, plaintiff had earlier admitted to receiving the December 9, 2012, mention sheet in his responses to the church's requests to admit.

¶ 34    Plaintiff testified that on December 9, 2012, he asked the members of the church not to attend the meeting scheduled for December 15.

¶ 35    On redirect examination, plaintiff testified that other than when he was ill and designated a substitute, plaintiff presided over all congregational meetings except for the December 15, 2012, meeting. Plaintiff also testified that he presided over all the board of deacons meetings when he was present.

¶ 36    Following plaintiff's testimony, plaintiff rested and defendants made a motion for a directed finding, which the trial court denied. Deacon Isaac Walker then testified for the defense that he was the chairman of the board of deacons, which was "the highest ranking board" at the church. Walker testified that the board of deacons was responsible for hiring

and firing employees and that the board had selected plaintiff to be the pastor of the church and presented him to the body of church members.

¶ 37 When asked about the October 20, 2012, church meeting in which the church members voted to amend the bylaws governing the procedure for terminating a pastor, Walker testified that the amendment permitted the vote to be by secret ballot rather than through a standing-vote method in which members were required to stand up to register their votes. Walker testified that this amendment was due to concerns about "intimidation," noting that people had been treated differently by plaintiff in the past based on whether plaintiff approved of the way they voted. According to Walker, "98 percent favored the secret ballot."

¶ 38 Walker testified that there was a meeting of the board of deacons on October 29, 2012, and that he prepared a letter containing his signature that was intended to be presented at that meeting; Walker characterized the letter as a letter of dissatisfaction. Prior to preparing the letter, he had discussed its contents with the other deacons, and they drafted the letter together at a meeting the Sunday before October 29, which included complaints and concerns that the deacons had received from church members involving the church's growth, declining membership, wasteful spending, plaintiff's Christian character, and plaintiff's lack of respect for members. A majority of deacons were present at the meeting, but plaintiff was neither notified about the meeting nor in attendance; Walker testified that the board of deacons "didn't consider [it] necessary to notify him" of the meeting because they did not consider it a board meeting. When asked whether the letter was written on his behalf or on behalf of the board of deacons and the church, Walker responded that "[b]y all means it was first of all the church and the deacon board" because "the church came to us." Walker explained that the board of deacons had noticed the problems itself, but after the members of the congregation

had raised the issue with the board as well, "we had to deal with it." On cross-examination, Walker testified that there was no vote of the congregation to send a letter of dissatisfaction to plaintiff, but "[t]he bylaws didn't require that."

¶ 39   Walker testified that plaintiff was present at the October 29, 2012, board of deacons meeting and, in fact, presided over the meeting. At the end of the meeting, Walker asked Deacon Charles Bridgeman to give the letter to plaintiff, which Bridgeman attempted to do. Walker testified that, initially, plaintiff would not accept the letter and Bridgeman laid the letter on a table. Eventually, plaintiff picked up the letter and began waving it around, asking who was responsible, and the board repeated to plaintiff that the letter was from the board of deacons. After plaintiff's questions, Walker "spoke as chairman" to inform plaintiff that "you have two weeks to get back to us with this—with an answer on this Letter of Dissatisfaction." Walker testified that the board of deacons "wanted to try to resolve this thing," but plaintiff did not respond during the two weeks following the October 29 meeting; Walker denied that plaintiff had offered to discuss any concerns the deacons had with him "at that very moment" the letter was offered to him, testifying that "he did not offer to discuss anything." Walker testified that at the time they presented the letter to plaintiff, "the pastor and church could no longer agree."

¶ 40   Walker testified that he also served as the superintendent of the church's Sunday school and that "most of the church announcements that go to the regular church body also come through the Sunday school," including announcements of meetings, sick members of the congregation, and funerals. Walker testified that church meetings, group meetings, and other meetings would be announced at the Sunday school, including announcements of board of deacons meetings. Walker explained that some of the people who attended Sunday school

14

might not attend the morning church service, "so we want to make sure they get the announcements."

¶ 41    Walker testified that on Sunday, December 2, 2012, he made an announcement at the end of Sunday school in which he announced that there would be a church meeting on December 15 for "the sole purpose of voting Reverend Jackson in or out," and emphasized that it was a "[v]ery, very important meeting." Walker testified that there were between 65 and 80 members present at Sunday school that day, which was approximately the same number as attended the church service that morning. Walker was also present at the church service that morning, and plaintiff read from the mention sheet but did not read the announcement concerning the church meeting, despite the fact that the meeting was listed on the mention sheet. Walker testified that the notice was not included in the December 2 church bulletin because the board of deacons did not inform the church secretary of the announcement in time for it to be printed in the bulletin.

¶ 42    Walker testified that he announced the meeting again at the end of Sunday school the following Sunday, December 9, and that there were again between 65 and 80 church members attending Sunday school. The meeting was also included in that day's church bulletin. Walker was also present at the church service that morning, and there were "about the same or less" church members at the service as had been at Sunday school. While making announcements over the pulpit, plaintiff "objected to the meeting, telling the people not to come; there would be no meeting on December 15." Walker continued that, "[i]n fact, he said if they came to the meeting, that [there] would be consequences. They would be sorry if they came to the meeting. He was daring them to come to the meeting."

¶ 43    Walker testified that there was a meeting on December 15, 2012, which he chaired "[a]s chairman of the board," and further testified that "the sole purpose of that meeting was to take a vote on whether we [were] going to retain Pastor Jackson as pastor or not." The outcome of the vote was "53 to 22, something on that order, 3 to 1, against Reverend Jackson as pastor."

¶ 44    Walker testified that he considered the 33 or 34 days between the October 29 letter of dissatisfaction and the first notice of the December 15 meeting to satisfy the bylaws' "one month written notice" requirement for terminating a pastor. Walker further testified that he did not believe that notice of the December 15 meeting was required to be made over the pulpit, but only needed to be a "public announcement."

¶ 45    At the close of the bench trial on September 4, 2014, the trial court found in favor of defendants, concluding:

> "After reviewing the evidence presented in these last couple days, I find that the church complied with the bylaws in termination which is the key threshold of this case.
>
> It's clear that [*sic*] to the court that the pastor and the church could no longer agree. I find testimony of the witness Deacon Walker to be credible.
>
> I find that the people of the church relayed their feelings to the deacons, and I find that the church sent a Letter of Dissatisfaction and that they complied with the special meetings that were required.
>
> It is therefore the opinion of the court there will be a finding for the defendant and against the plaintiff."

16

The trial court entered a written order finding in favor of the church and against plaintiff on the same day. Plaintiff timely filed a notice of appeal, and this appeal follows. Defendants did not file a brief on appeal, so we take the instant appeal for consideration on the record and plaintiff's brief only.

¶ 46                                                ANALYSIS

¶ 47        On appeal, plaintiff argues that the trial court abused its discretion by excluding certain of his witnesses and erred in concluding that defendants did not violate the bylaws when they terminated him. We consider each argument in turn.

¶ 48                                             I. Jurisdiction

¶ 49        As an initial matter, as an appellate court, we are required to consider our jurisdiction, even if the parties do not raise the issue. *A.M. Realty Western L.L.C. v. MSMC Realty, L.L.C.*, 2016 IL App (1st) 151087, ¶ 67. In the case at bar, we must ask whether or not the doctrine of ecclesiastical abstention prohibits us from exercising jurisdiction over this dispute. Before trial, the church filed a motion to dismiss, arguing that secular courts cannot intervene in controversies involving the selection or removal of clergy. The trial court denied the church's motion. Although defendants did not raise this issue on appeal, we address it to confirm our jurisdiction.

¶ 50        The doctrine of ecclesiastical abstention provides that, pursuant to the guarantee of free exercise of religion included in the first amendment to the United States Constitution, "civil courts may not determine the correctness of interpretations of canonical text or some decisions relating to government of the religious polity; rather, courts must accept as given whatever the religious entity decides." *Duncan v. Peterson*, 408 Ill. App. 3d 911, 915 (2010) (citing *Serbian Eastern Orthodox Diocese for the United States of America & Canada v.*

*Milivojevich*, 426 U.S. 696, 709 (1976)). However, where a church dispute does not raise issues of church doctrine, the first amendment does not require deference to decisions of religious entities. *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713-14 (1991). Instead, the court may use the "neutral principles of law" approach, in which the court examines pertinent church charters, constitutions and bylaws, deeds, State statutes, and other evidence to resolve the matter the same way it would a secular dispute. *Tanios*, 213 Ill. App. 3d at 713-14. In short, whether or not a civil court may exercise jurisdiction over a dispute involving a religious organization depends on whether resolution of the claims is possible without inquiry into religious principles and doctrines. *Abrams v. Watchtower Bible & Tract Society of New York, Inc.*, 306 Ill. App. 3d 1006, 1011 (1999).

¶ 51    A civil court may not exercise jurisdiction over an employment dispute between a church and a church member if the parties are bound by the church's law, which provides its own procedures for entering employment contracts, and the plaintiff alleges a violation of only civil law. *Gabriel v. Immanuel Evangelical Lutheran Church, Inc.*, 266 Ill. App. 3d 456, 459-60 (1994). For instance, in *Gabriel*, a teacher sued her church for breach of contract after the church withdrew its offer to employ her as a parochial school kindergarten teacher. *Gabriel*, 266 Ill. App. 3d at 457. The teacher alleged that the parties had entered into a contract, which had become binding under civil contract law after the church had made her an offer and she had accepted the offer by signing it. *Gabriel*, 266 Ill. App. 3d at 458. However, the plaintiff was a commissioned minister of religion under the structure of the church, and thus she was not a secular employee. *Gabriel*, 266 Ill. App. 3d at 459. The church's constitution had its own procedures for appointing ministerial employees, and these procedures required that the church both extend an offer and perform an "installment," the latter of which the church

alleged it never performed before revoking its offer to employ the plaintiff. *Gabriel*, 266 Ill. App. 3d at 458. The appellate court held that it did not have jurisdiction over the complaint because the church's process for hiring teachers was an ecclesiastical matter. *Gabriel*, 266 Ill. App. 3d at 460.

¶ 52      Conversely, where a complaint alleges that a church has violated its own bylaws, a civil court may exercise jurisdiction to decide whether the church has violated its bylaws. *Ervin v. Lilydale Progressive Missionary Baptist Church*, 351 Ill. App. 3d 41, 46 (2004). In *Ervin*, a pastor was discharged without a congregation vote, which was required before termination under the church's bylaws. *Erwin*, 351 Ill. App. 3d at 41-42. The church conceded that it had violated its bylaws, but challenged jurisdiction. *Erwin*, 351 Ill. App. 3d at 46. The appellate court held that, while churches have the autonomy to select their clergy in compliance with the church's governing law, "the first and fourteenth amendments do not prohibit court intervention when the church fails to follow the procedures it has, itself, enacted." *Erwin*, 351 Ill. App. 3d at 46.

¶ 53      In the case at bar, we find that civil jurisdiction is proper. *Gabriel* is distinguishable because the plaintiff in that matter was contending that civil law, instead of church law, should apply, but the appellate court in *Gabriel* found that the dispute was an ecclesiastical matter because the parties were both subject to the church's law regarding whether to employ the plaintiff. In the case at bar, however, the parties agree on what law applies, *i.e.*, defendants' bylaws, and the dispute is over whether or not defendants violated those bylaws. Thus, the trial court correctly concluded that *Ervin* is controlling. Like the dispute in *Ervin*, plaintiff asserts that the church violated its own bylaws. Accordingly, we have jurisdiction to determine whether or not defendants followed the proper procedure for terminating plaintiff.

¶ 54    Furthermore, deciding whether or not defendants violated the bylaws in the present case will not require inquiry into a religious doctrine, and may be resolved using neutral principles of civil law. Plaintiff's complaint alleges that defendants breached the parties' oral agreement by failing to comply with the bylaws. Specifically, plaintiff alleges that defendants failed to (1) provide a written notice of dissatisfaction; (2) hold a special meeting; (3) provide notice of a vote to the members; and (4) have a proper membership vote. To resolve this dispute, we need only look to the plain text of the church's bylaws and the relevant facts to determine whether or not defendants breached their oral agreement by failing to comply with its bylaws. Since we need not inquire into any religious doctrines, and can address this issue employing neutral principles of civil law, we have jurisdiction to decide whether defendants breached their oral agreement with plaintiff.

¶ 55                                    II. Motion to Bar Witnesses

¶ 56    Turning to the merits of plaintiff's arguments on appeal, plaintiff first argues that the trial court erred in granting the church's motion to bar plaintiff's witnesses. In the case at bar, on August 28, 2014, the trial court granted the church's motion to bar witnesses for failure to comply with supreme court rules and rules of civil procedure "for the reasons given in open court." Under Illinois Supreme Court Rule 213(d) (eff. Jan. 1, 2007), "[w]ithin 28 days after service of the interrogatories upon the party to whom they are directed, the party shall serve a sworn answer or an objection to each interrogatory." Furthermore, "[u]pon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide" the subject on which the witness will testify. Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007). "The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004).

20

¶ 57　　　　In the case at bar, on June 11, 2014, the church served plaintiff with interrogatories, requesting, *inter alia*, the names of any witnesses intended to testify at trial. On June 26, 2014, the trial court ordered that discovery would close on July 17, 2014. According to the church's motion to bar plaintiff's witnesses, plaintiff did not serve the church with his witness list until August 21, 2014, after discovery had closed and less than two weeks before trial. At the time that discovery had closed, plaintiff had only identified one witness, namely, plaintiff himself, and the church had deposed plaintiff. Thus, the witness list plaintiff served the church on August 21 was untimely and did not comply with the terms of Rule 213.

¶ 58　　　　Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) authorizes the trial court to impose a sanction, including barring a witness from testifying, upon any party who unreasonably refuses to comply with any provisions of the supreme court's discovery rules or any order entered pursuant to said rules. Here, as noted, the trial court granted the church's motion to bar witnesses for failure to comply with supreme court rules and rules of civil procedure "for the reasons given in open court." We can find no error in this decision.

¶ 59　　　　In addition to authorizing sanctions, Rule 219(c) provides that "where a sanction is imposed under this paragraph (c), the judge shall set forth with specificity the reasons and basis of any sanction so imposed either in the judgment order itself or in a separate written order." Ill. S. Ct. R. 219(c) (eff. July 1, 2002). Plaintiff first argues that the trial court "unequivocally violated" Rule 219(c) by "providing no explanation" in its written order. We do not find this argument persuasive.

¶ 60　　　　In the case at bar, the trial court barred certain plaintiff's witnesses "for the reasons given in open court." However, the record on appeal does not contain a report of proceedings or bystander's report from the court date at which the trial court made its ruling. Plaintiff, as the

appellant, bears the burden of providing a sufficiently complete record to support his claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Moreover, any doubt arising from the incompleteness of the record will be resolved against the appellant. *Foutch*, 99 Ill. 2d at 392. Since we do not have the transcript of the hearing, we must presume that the trial court set forth a sufficient factual basis for barring plaintiff's witnesses, a factual basis which was then expressly incorporated into the written order barring the witnesses.

¶ 61       Furthermore, the trial court's failure to set forth the reasons for a sanction is not *per se* reversible error, "particularly where *** the trial court's order grants a written motion that spells out the reasons for the dismissal and those reasons are supported by the record." *Chabowski v. Vacation Village Ass'n*, 291 Ill. App. 3d 525, 528 (1997); see also *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 790 (2009) ("This court has relaxed th[e] requirement [that the trial court set forth the reasons for a sanction] in cases where the sanction was entered pursuant to a written motion, as this court assumed that the reasons for the sanction were those set out in the motion."); *Glover v. Barbosa*, 344 Ill. App. 3d 58, 63 (2003) ("[A] court's failure to set out the grounds for sanctions is not *per se* reversible error. *** We can assume that the reasons for the *** sanction are those set out in [the written] motion, absent contrary evidence of record."). Here, since the trial court barred plaintiff's witnesses pursuant to defendants' written motion and the trial court's decision to bar plaintiff's witnesses is supported by the record, the trial court's written order offers no basis for reversal.

¶ 62    A trial court's decision to impose a sanction under Rule 219(c) will not be reversed absent a clear abuse of discretion. *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). A trial court abuses its discretion where no reasonable person would take the view adopted by the court. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. In determining whether the trial court abused its discretion in imposing a sanction, the reviewing court must look to the same factors that the trial court was required to consider in deciding an appropriate sanction. *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). The factors the trial court must consider in determining whether excluding a witness is an appropriate sanction are: "(1) surprise to the adverse party; (2) the prejudicial effect of the witness' testimony; (3) the nature of the witness' testimony; (4) the diligence of the adverse party; (5) whether objection to the witness' testimony was timely; and (6) the good faith of the party calling the witness." *Martin*, 155 Ill. 2d at 314. No single factor is determinative. After examining these factors, we cannot find that the trial court abused its discretion in barring plaintiff's witnesses.

¶ 63    First, defendants were clearly surprised by plaintiff supplementing his witness list with 10 additional witnesses. Rule 213(f) provides, in pertinent part, that "[u]pon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial." Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007). "[A] party should be allowed to rely on an opposing party's answer to Rule 213(f) interrogatories and expect that only those witnesses disclosed pursuant to Rule 213(f) will in fact be called to testify at trial ***." *American Service Insurance Co. v. Olszewski*, 324 Ill. App. 3d 743, 748 (2001); see also *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 946 (2000) ("Rule 213 is designed to give those involved in the trial process a degree of certainty and predictability that furthers the

23

administration of justice and eliminates trial by 'ambush.' "). "Further, Supreme Court Rule 213(i) imposes on each party a continuing duty to inform the opponent of new or additional information whenever such information becomes known to the party." *Sullivan*, 209 Ill. 2d at 109. In the case at bar, on July 15, 2014, plaintiff served defendants with his answers to defendants' interrogatories, identifying plaintiff as the only witness intended to testify at trial. While preparing for trial, defendants relied on plaintiff's answers and expected that only plaintiff would be called to testify at trial. It was not until August 20, 2014, 34 days after the close of discovery and two weeks before trial, that plaintiff served defendants with his supplemental response to defendants' interrogatory No. 3, identifying 10 additional witnesses. Allowing plaintiff's 10 additional witnesses to testify at trial with only two weeks' notice to defendants would result in exactly the type of ambush that Rule 213(f) is designed to prevent.

¶ 64    Plaintiff argues that allowing his witnesses to testify would have resulted in no surprise to defendants because defendants should have anticipated that plaintiff would supplement his witness list in response to defendants' supplemental answers to interrogatories, which provided greater detail regarding the expected testimony of defendants' witnesses. However, plaintiff fails to explain why the details contained in defendants' supplemental answers should have put defendants on notice that plaintiff would subsequently supplement his witness list. Since plaintiff provides no basis for his argument beyond the allegation itself, we cannot find the argument persuasive.

¶ 65    With respect to the second factor, plaintiff argues that allowing his additional witnesses to testify would have had no prejudicial effect on defendants because both parties provided their original witness lists two days before the close of discovery, so even if plaintiff had

included his 10 additional witnesses in his original witness list, defendants would not have had an opportunity to depose the witnesses. We do not find this argument persuasive. "Relevant considerations in assessing prejudice on appeal are the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of continuance rather than a more drastic sanction, and the willfulness of the plaintiff in failing to disclose the witness." *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 926 (1998). In the case at bar, plaintiff claims that his additional witnesses would have been able to provide testimony rebutting Walker's testimony that at the end of Sunday school on December 2, 2012, and December 9, 2012, Walker announced the December 15, 2012, church meeting for the purpose of voting on plaintiff's termination. As plaintiff was not present for Walker's alleged announcements and could not rebut Walker's testimony himself, the rebuttal testimony of plaintiff's additional witnesses could have been very strong evidence against defendants. Permitting those witnesses to testify without giving defendants an opportunity to depose them or otherwise prepare to cross-examine them would have been prejudicial to defendants and this factor weighs in favor of barring the witnesses' testimony.

¶ 66    With respect to the third factor, plaintiff argues that his witnesses should not have been barred from testifying due to the nature of their testimony. Plaintiff claims that his witnesses would have been able to provide testimony illuminating the customs and practices of the church relevant to plaintiff's termination, including the content and circulation of church bulletins, the content of mention sheets, and the method of operations of deacon meetings and other church meetings. However, this is all information that plaintiff would have known from the inception of the lawsuit he would need to prove, as he had the burden of proving

that defendants failed to comply with the bylaws. Thus, this factor does not weigh in plaintiff's favor.

¶ 67     Finally, plaintiff claims that he exercised good faith prior to supplementing his witness list because he sent defendant a letter pursuant to Illinois Supreme Court Rule 201(k) (eff. Jan. 1, 2013) when defendants' answers to certain interrogatories did not provide adequate information pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). Plaintiff also claims that when defendants served plaintiff with their supplemental answers to interrogatories, plaintiff timely supplemented his witness list. However, plaintiff fails to acknowledge that defendants' discovery responses provided just as much information as plaintiff's initial discovery responses, so an argument that there was insufficient information is disingenuous; we find even plaintiff's supplement to his witness list to be inadequate. Furthermore, even if this factor weighed in favor of plaintiff, none of the other factors do.

¶ 68     Although plaintiff does not discuss the diligence of the adverse party or whether objection to the witnesses' testimony was timely, we find that these factors also weigh in favor of barring plaintiff's witnesses. We find that defendants were diligent because the church timely served plaintiff with its interrogatories, requesting the identities of persons having knowledge of any of the facts alleged in the case. See *Curran Contracting Co. v. Woodland Hills Development Co.*, 235 Ill. App. 3d 406 (1992) (holding that the defendants were diligent where they requested the identities of persons having knowledge of the allegations in the complaint). We also find that defendants' objection to the witnesses' testimony was timely, as the church filed its motion to bar plaintiff's witnesses two days after being served with plaintiff's supplemental witness list. Thus, we find that surprise to defendants, the prejudicial effect of the witnesses' testimony, the nature of the witnesses'

testimony, defendants' diligence, and defendants' timely objection to the witnesses' testimony all weigh in favor of barring plaintiff's witnesses. Accordingly, we find that the trial court did not abuse its discretion when it granted defendants' motion to bar plaintiff's witnesses.

¶ 69                                    III. Compliance With Bylaws

¶ 70        Plaintiff also argues that the trial court erred in finding that defendants had complied with the church's bylaws in terminating plaintiff's employment. Plaintiff contends that the question of compliance with the church's bylaws is a question of contract interpretation, which should be reviewed *de novo*. Plaintiff is correct that our review from a trial court's interpretation of a contract as a matter of law is *de novo*. *Village of Palatine v. Palatine Associates*, *LLC*, 2012 IL App (1st) 102707, ¶ 44 (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). Thus, if the question at hand was solely one of contract interpretation, the standard of review would be *de novo*. However, the question of compliance with the bylaws requires this court to review the trial court's findings in regards to the conduct of defendants. Review of defendants' conduct is a question of fact, not contract interpretation, and a trial court's finding of fact and credibility are accorded great deference. *Eychaner v. Gross*, 202 Ill. 2d 228, 270 (2002) (quoting *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989)). Thus, the trial court's holding will not be reversed unless it is found to be against the manifest weight of the evidence. *Eychaner* 202 Ill. 2d at 252 (citing *In re Estate of Zukerman*, 218 Ill. App. 3d 325, 330 (1991)).

¶ 71    Furthermore, a bench trial, such as the one that occurred in the case at bar, requires the court to weigh the evidence and make findings of fact and where the findings of fact depends on the credibility of witnesses, the reviewing court will defer to the trial court's holding unless they are against the manifest of the weight of evidence. *Eychaner*, 202 Ill. 2d at 251 (citing *Chicago Investment Corp v. Dolins*, 107 Ill. 2d 120, 124 (1985)). A holding is considered to be against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252 (citing *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996)).

¶ 72    In the case at bar, part II, section I, subsection (D) of the church's bylaws is labeled "term of office" and states that once a pastor is elected, he "serves until the position is terminated by his request or the church's request." Plaintiff argues that in order for defendants to have been compliant with the church's bylaws in terminating him, they were required to satisfy parts (2), (3), and (4) of subsection (D). Plaintiff additionally argues that defendants were not compliant with the church's bylaws because they failed to follow proper procedure in terms of calling the meetings, delivering the letter of dissatisfaction, or giving proper notice of termination. Although it is unclear whether defendants are required to satisfy each part of subsection (D) in order to be compliant, we agree with the trial court that even if they were, defendants completed all applicable portions of subsection (D) and were thus compliant with the church's bylaws in terminating plaintiff's employment.[5]

---

[5]Part (1) of subsection (D) states that termination can occur with a "one month's written notice from the pastor." Thus, the pastor has the option to terminate his employment by himself. However, since plaintiff did not seek to terminate his employment, part (1) is inapplicable and would not be a required component for defendants to be compliant with the church's bylaws.

¶ 73    First, part (2) of subsection (D) states that the pastor may be terminated by a "one month's written notice from the church." In the case at bar, Walker testified that the board of deacons presented plaintiff with a letter of dissatisfaction on October 29 and testified that he believed part (2)'s one-month requirement was satisfied by the 33 to 34 days between the October 29 letter of dissatisfaction and the December 15 meeting. On appeal, plaintiff does not dispute that the letter of dissatisfaction can serve as the "written notice" required by part (2) and, in fact, describes the letter of dissatisfaction as "initiat[ing] his termination process." Accordingly, taking the letter of dissatisfaction as "written notice," we cannot find that the trial court erred in finding that defendants complied with part (2) by giving plaintiff one month's notice from the church of his termination.

¶ 74    Second, part (3) of subsection (D) states that a pastor can be terminated with a "notice of dissatisfaction." Once the written notice of dissatisfaction has been given to the pastor "he must respond to a special meeting with the Deacon Board within two weeks." Walker testified that on October 29, 2012, the board of deacons held a meeting where they gave plaintiff the notice of dissatisfaction. At trial, plaintiff admitted that he refused to accept a sealed envelope that was given to him at that meeting and Walker testified that the envelope contained the letter of dissatisfaction. Impeding the board of deacons' attempt to present the letter by refusing service does not permit plaintiff to then claim that defendants failed to comply with part (3). See *Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 966 (1981) (quoting *Ehard v. Pistakee Builders, Inc.*, 111 Ill. App. 2d 227, 233 (1969)) (noting that a party to a contract may not complain of the nonperformance of the other party where that performance is prevented by one's own actions). Additionally, plaintiff claims that the notice of dissatisfaction was improper because he was not provided notice of the board of deacons

meeting during which the letter was drafted, even though the church's bylaws provided that plaintiff was to be an *ex officio* member of all boards and committees. Part (3), however, does not require the board of deacons to have a vote of dissatisfaction, nor does it require a vote on issuing a letter of dissatisfaction. Part (3) is silent as to any action required to occur prior to the issuance of a notice of dissatisfaction, but only requires that the pastor must respond to a special meeting after receiving one. Here, plaintiff does not dispute that he did not attend a special meeting within two weeks of him being presented with the letter. Thus, we cannot find that the trial court erred in finding that defendants acted in compliance with subsection (D), part (3) when they attempted to deliver the notice of dissatisfaction to plaintiff but plaintiff refused to accept the notice.

¶ 75   Finally, part (4) of subsection (D) provides that if the church wants to dismiss the pastor, "the chairman of the board of deacons may call a special meeting of the membership" to terminate the pastor. In the case at bar, plaintiff argues that defendants were not in compliance with part (4) because of improper notice to the congregation. The bylaws provide that there must be "public notice *** given two (2) consecutive Sundays [p]rior to the meeting." A membership meeting was called by the board of deacons to discuss the termination of plaintiff and was scheduled to take place on December 15, 2012. Walker testified that during announcements at the end of Sunday school on December 2, 2012, he explicitly announced that there was a meeting on December 15 that had the sole purpose of voting on whether or not to retain plaintiff as pastor. Additionally, Walker testified that an announcement for the December 15 meeting was placed in the mention sheet for December 2, 2012, but that plaintiff did not make the announcement during the service. Next, Walker testified that notice of the meeting was placed in the church bulletin for the worship service

on December 9, 2012, the Sunday prior to the December 15, 2012, meeting. Plaintiff was also given a mention sheet containing announcements to be made to the entire church, which included an announcement for the church meeting scheduled for December 15, 2012. Plaintiff admitted that he ordered the congregation not to attend the meeting. Thus, there was notice of the December 15 meeting two consecutive Sundays prior to the meeting.

¶ 76    Plaintiff argues that the December 2 notice was ineffective because the notice was not given from the pulpit. We do not find this argument persuasive. The bylaws do not require that the public notice be given from the pulpit. Unlike the provision for selecting a pastor which requires "[p]ublic notice *** from the pulpit," the procedure for terminating a pastor does not contain such a requirement. Furthermore, Walker testified that the December 15 meeting was listed in the December 2 mention sheet, but plaintiff did not make the announcement to the congregation at the worship service that day. Again, plaintiff cannot impede defendants' attempts and then claim no compliance. See *Barrows*, 94 Ill. App. 3d at 966. Thus, we cannot find that the trial court erred in finding that defendants acted in compliance with part (4) by properly announcing the special meeting two consecutive Sundays prior to the December 15, 2012 meeting. Accordingly, even if defendants were required to complete every applicable part of subsection (D) in order to terminate plaintiff's employment, we agree with the trial court that their actions still satisfied the requirements of subsection (D) of the church's bylaws.

¶ 77                                    CONCLUSION

¶ 78    For the reasons set forth above, the trial court's judgment in favor of defendants is affirmed. The trial court did not abuse its discretion in barring plaintiff's witnesses from testifying at trial and the trial court's conclusion that defendants complied with the church's

bylaws in terminating plaintiff's employment was not against the manifest weight of the evidence.

¶ 79        Affirmed.