2024 IL App (1st) 230575-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
July 15, 2024

No. 1-23-0575

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| CRISTINA VYSE f/k/a Cristina Yarbrough and DAVID GOODPASTER, Individually and on Behalf of Hayley Joe Goodpaster, a Minor, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 18 L 3144 |
| NORTHWESTERN MEMORIAL HOSPITAL and NORTHWESTERN MEDICAL FACULTY FOUNDATION, | ) ) ) ) | The Honorable Janet Adams Brosnahan, Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:*    Trial court did not abuse its discretion with respect to plaintiffs' efforts to publish a contract to the jury in a medical negligence case or in barring testimony by the minor whose damages were at issue in the case due to plaintiffs' failure to disclose her as a witness.

¶ 2    This appeal involves an action for medical negligence in which a Cook County jury returned a verdict in favor of the defendants, Northwestern Memorial Hospital (NMH) and Northwestern Medical Faculty Foundation (NMFF), and against the plaintiffs, Cristina Vyse (formerly Cristina

Yarbrough) and David Goodpaster, individually and on behalf of their minor daughter Hayley Joe Goodpaster. The plaintiffs request this court to vacate the defense verdict and remand this case for a new trial based on two claims of error by the trial court: (1) denying the admission and publication to the jury of an affiliation agreement between the defendants and Erie Family Health Center, Inc. (Erie), and (2) barring testimony at trial by Hayley Goodpaster. We affirm.

¶ 3                                         I. BACKGROUND

¶ 4      This action arises out of the prenatal medical care that Christina Vyse received when she was pregnant with her daughter Hayley, who was born prematurely on April 8, 2006, at 26 weeks gestation. During her pregnancy, the primary provider of her care was Erie, a Federally Qualified Health Center that has an "affiliation agreement" with NMH and NMFF.[1] The affiliation agreement reflects a general agreement that NMH and NMFF will provide certain medical services to the patients served by Erie, most of whom have otherwise limited access to health care. In an earlier appeal, the Illinois Supreme Court answered a certified question holding that NMH could not be held vicariously liable under the doctrine of apparent agency for alleged negligence by employees of Erie, an independent medical clinic not party to this litigation. See *Yarbrough v. Northwestern Memorial Hospital*, 2017 IL 121367, ¶ 49. Accordingly, no claims based on the conduct of Erie employees remain as part of this case.

¶ 5      On November 30, 2005, at approximately 8 weeks of pregnancy, Vyse experienced vaginal bleeding for which she was seen in the emergency department of Advocate Illinois Masonic Medical Center (Advocate). There, she underwent an abdominal ultrasound that showed her

_____

[1] The actual signatories to the affiliation agreement, dated April 15, 1998, are Erie and Northwestern Memorial Corporation (NMC). An addendum titled "NMFF Appendix to Affiliation Agreement" is attached to it that is not signed on behalf of NMFF. However, on appeal the defendants do not dispute that the affiliation agreement applies to them.

pregnancy and a probable "bicornuate uterine morphology," meaning her uterus was heart-shaped. Having a bicornuate uterus placed Vyse at increased risk of complications during pregnancy, such as cervical insufficiency (in which the cervix is too weak to maintain the pregnancy in the uterus for a full term of 40 weeks), preterm delivery, or miscarriage. Vyse's primary healthcare provider at Erie, certified nurse midwife Elizabeth McKelvey, C.N.M., was informed by the emergency department personnel at Advocate of this ultrasound finding of bicornuate uterus.

¶ 6    In February 2006, McKelvey referred Vyse to NMH's Prentice Women's Hospital (Prentice) for a 20-week ultrasound. The referral form stated in pertinent part: "TO THE CONSULTANT: Thank you for your assistance in evaluating the above patient, who is being referred for: *OB Ultrasound—Level 1*." (The italicized portion of the preceding sentence was handwritten, with the remainder being preprinted.) The form provided a history that Vyse was 20 years old, that this was her first pregnancy, and that her estimated delivery date was July 12, 2006. It stated nothing about Vyse undergoing a prior ultrasound or the finding of a probable bicornuate uterus.

¶ 7    On February 21, 2006, Vyse underwent this 20-week ultrasound at Prentice. A sonographer performed the ultrasound, and the images obtained were read and interpreted by William Grobman, M.D., a maternal-fetal medicine physician employed by defendant NMFF. It is undisputed that Dr. Grobman's involvement in Vyse's medical care consisted only of reading and interpreting images that the sonographer obtained from this ultrasound; he did not speak to Vyse or otherwise ascertain that she had undergone an ultrasound earlier in her pregnancy that had revealed a bicornuate uterus. Dr. Grobman interpreted and reported the 20-week ultrasound as normal, and he did not note a bicornuate uterus on the images obtained. A disputed issue at trial, which gives rise to the primary issue on appeal, was whether Dr. Grobman had any duty to perform a more extensive consultation with Vyse that would have led him to learn of the earlier ultrasound finding of a bicornuate uterus.

¶ 8    Following the ultrasound, Vyse continued receiving prenatal care at Erie. On April 5, 2006, she began experiencing painful cramps and back pain. She was admitted to NMH, where she delivered Hayley on April 8, 2006. Hayley was born with multiple medical complications and has continued to experience disabilities throughout her life.

¶ 9    In 2009, the plaintiffs filed the present action against NMH and NMFF. Following remand from the above-referenced appeal, litigation proceeded on a claim that the defendants were vicariously liable for the medical negligence of their actual or apparent agent, Dr. Grobman, with respect to the care he provided to Vyse in connection with the 20-week ultrasound of February 21, 2006. The following paragraphs from the operative fourth amended complaint provide a general summary of claims upon which this case ultimately went to trial:

"13. *** [Vyse] received a 20-week ultrasound at NMH's Prentice Women's Hospital on February 21, 2006. *** [D]uring this visit, no history or questionnaire was done by any employee, agent, or otherwise prior to, during, or after, her 20 week obstetrical ultrasound exam, in violation of the standard of care. A fetal anatomy scan was performed as part of the ultrasound examination. Grobman interpreted the fetal anatomy scan as normal and Vyse's pelvis as normal. He recorded his findings in a report, dated February 21, 2006. He did not diagnose Vyse's bicornuate uterus or short cervix, in violation of the standard of care. Grobman did not document any findings regarding the condition of Vyse's cervix, or even mention the cervix in his report, in violation of the standard of care. ***

14. Defendants should have, but did not, provide any care or treatment to Vyse to diagnose and/or remedy the risk of premature birth posed by Vyse's short, incompetent cervix and bicornuate uterus. Defendants did not diagnose Vyse's bicornuate uterus and short, incompetent cervix until after Hayley was born.

15. Vyse's providers at Erie appropriately relied on Grobman, NMH, and NMFF to determine whether Vyse had an incompetent cervix or bicornuate uterus, because Grobman was a perinatologist with specialized training in interpreting ultrasounds. As a direct and proximate result of Grobman's negligent failure to image Vyse's cervix and bicornuate uterus and assessment of the pelvis as normal, Vyse did not receive any care to prevent premature birth of Hayley, including but not limited to a cerclage, close monitoring, and repeat ultrasound."

¶ 10        Trial of this case was eventually scheduled to commence on August 16, 2022. As that date approached, the parties' attorneys communicated several times about whether Hayley, who would be 16 years old by the time of trial, would be called by the plaintiffs to testify. Prior to then, the plaintiffs had never disclosed Hayley as a witness they intended to call at trial pursuant to Supreme Court Rule 213(f)(1) (eff. Jan. 1, 2018). The defendants, however, did disclose that Hayley would be called as an adverse witness. On February 6, 2022, defendants' counsel sent an e-mail to the plaintiffs' counsel requesting a deposition of Hayley based upon the assumption that, given her age by the time of trial, the plaintiffs would call her as a witness. (In the alternative, defense counsel requested a "meet and greet" for settlement purposes.) Plaintiffs' counsel responded that the idea made sense and that he would discuss it with his clients. On June 22, 2022, defendants' counsel raised the topic again in an e-mail, stating, "I suspect that if you intend to call her to testify, we are going to need a formal deposition." Plaintiffs' counsel responded by e-mail the following day, asking to hold a date for a deposition but stating, "We have not yet decided on whether we will call her to testify." On July 19, 2022, the plaintiffs' attorney sent an e-mail offering "a meet-and-greet with Hayley for settlement purposes." That e-mail mentioned nothing about a deposition or whether she would be called as a witness at trial.

¶ 11      On July 27, 2022, defendants' counsel sent an e-mail to plaintiffs' counsel with a draft of a joint proposed witness list to be read during jury selection, which included Hayley's name. On July 29, 2022, plaintiffs' counsel responded by adding an asterisk next to Hayley's name on the witness list as an indication that Hayley was a witness whom the plaintiffs anticipated calling at trial. Finally, in an e-mail exchange on August 15, 2022, concerning the upcoming schedule of trial witnesses, plaintiffs' counsel wrote that he expected Hayley's testimony to be on August 23, 2022. On August 16, 2022, following a verbal discussion of the matter at the end of the first day of trial, the defendants filed a written motion to bar Hayley's testimony on the basis that the plaintiffs had never disclosed her as a witness pursuant to Rule 213(f)(1), they had never confirmed their intent to call her as a trial witness, and they had never produced her for deposition. The trial court heard argument on this motion the following morning, and at the conclusion of that hearing, it granted the motion to bar her testimony.

¶ 12      On a separate matter, shortly before opening statements on the morning of August 16, 2022, the plaintiffs presented a written motion to reference and publish the affiliation agreement between Erie and the defendants during opening statements. That motion asserted that a factual dispute existed as to whether, on February 21, 2006, the defendants undertook to provide Vyse with a consultation in the area of maternal-fetal medicine (*i.e.*, Dr. Grobman's medical specialization, which involves high-risk pregnancies), or whether the extent of the defendants' obligation was to conduct, read, and interpret Vyse's 20-week ultrasound. It explained that the defendants' position was that there was no need for Dr. Grobman to perform a maternal-fetal medicine consultation that day or obtain a history from Vyse. It asserted that the affiliation agreement was relevant to the obligations that the defendants undertook to provide, which included not merely radiological services but all " 'appropriate and necessary specialty care for [Erie] patients.' "

¶ 13 At argument on the motion, the trial court expressed skepticism as to whether the plaintiffs would be able at trial to establish a foundation to admit the affiliation agreement into evidence. It was not the plaintiffs' plan to use this document with any witness. Instead, the plaintiffs intended to establish the foundation by reading excerpts from the discovery depositions of two of the defendants' corporate representatives as statements of a party-opponent. The trial court had not reviewed the excerpts as of this time and asked plaintiffs' counsel to provide them. The record reflects that plaintiffs' counsel tendered 75 pages of transcript. The trial court stated it could not assess the foundation and relevance of the affiliation agreement prior to opening statements, and accordingly it ruled that plaintiffs' counsel could not publish it during opening statements.

¶ 14 That evening, the plaintiffs filed an amended motion to admit the affiliation agreement into evidence and to read excerpts from the discovery depositions of two of the defendants' corporate representatives to lay the foundation for doing so. In that motion, the plaintiffs argued as follows about the relevance of the affiliation agreement to the question of whether a maternal-fetal medicine consultation was required when Vyse went to Prentice for the ultrasound on February 21, 2006:

> "[T]he Affiliation Agreement *** is relevant to this dispute. It illustrates the understanding between Erie *** and the Defendants whereby patients like [Vyse] were referred to Northwestern for consultation and specialty care. In the Affiliation Agreement, Northwestern Memorial promises to 'act as a primary site for acute and specialized hospital care for its [Erie's] patient population.' [Citation.] The Affiliation Agreement indicates that Northwestern was required to provide patients like [Vyse] with sufficient patient care by providing 'comprehensive health care services' and by 'provid[ing] all appropriate and necessary services to patients referred…' [Citation.] The Affiliation Agreement provides

relevant documentary evidence of Northwestern Memorial's obligations to provide not just radiological services, but also 'appropriate and necessary specialty care for such EFHC [Erie] patients.'

* * *

The transcript portions along with the Affiliation Agreement are relevant to the issue of whether a consultation was requested as a factual matter and whether one was required under the standard of care. They support Plaintiffs' position that Ms. Vyse's referral to Northwestern Memorial Hospital in connection with a 20-week ultrasound was a request for a consultation, and that a consultation should have been provided. The Affiliation Agreement reflects that Erie relied on Northwestern Memorial Hospital for specialty health care services generally—not merely as a diagnostic testing center. This makes it more likely that a maternal-fetal medicine consultation was requested—and that more was required in the way of gathering patient health information beyond mere acquisition of ultrasound images."

¶ 15    Argument on this amended motion was continued as the trial schedule allowed, beginning prior to testimony on August 17, 2022. In summary, the defendants emphasized that none of the plaintiffs' experts were going to use the affiliation agreement as a basis for an opinion that a consultation was required under the standard of care. They further argued that as a contract, it did not speak to whether a consultation was required in this circumstance. As such, they argued, it had no probative value to the case. The trial court agreed that its relevance was not in establishing the standard of care. However, the trial court stated that apart from the standard of care, it had a "contextual-type relevance so the jury understands that when [Vyse] is referred from Erie to Northwestern, Northwestern has agreed to provide certain services to her. Precisely what those

services are, I think, is a contested issue of fact." Accordingly, the trial court stated that it believed the affiliation agreement had probative value and should be allowed, but it wanted a better understanding of how the plaintiffs' attorney intended to use it during the plaintiffs' case-in-chief or in cross-examination of defense witnesses. The trial court directed plaintiffs' counsel to be prepared the following morning to explain specifically how the plaintiffs intended to present or use this evidence at trial.

¶ 16     The next morning, plaintiffs' counsel informed the trial court that his request was to read the deposition excerpts that laid the foundation for the affiliation agreement and thereafter to provide the jury with a full copy of the 8-page affiliation agreement to read. The defense objected, and the trial court stated that it would not allow the entire agreement to be provided to the jury. During continued argument into deposition excerpts that plaintiffs' counsel wanted to read to the jury, the following colloquy took place between plaintiffs' counsel and the trial court:

> "MR. THRONSON [(PLAINTIFFS' COUNSEL)]: * * * I think what would be helpful for the plaintiffs is if we had an understanding of what your Honor would feel was appropriate in terms of the mechanism to prove the agreement or portions thereof to the jury.
>
> So we had suggested, you know, providing a full and unredacted portion of the agreement so the jury has the context. It sounds like that was regarded by your Honor as inappropriate. So we just want to get a sense of if we should just be reading portions of the agreement into evidence or displaying portions on the screen and that would give us a sense of what we might need to, if anything, quote from these depositions in terms of the portions of the agreement.
>
> THE COURT: I'm not going to tell you how I think you should put your case on.

That's why I asked you yesterday to directly pose the request to me as to what you want to do and how you want to do it, and then I will rule on your request.

So considering the request to read in portions of the deposition transcripts as statements of party opponents, and I'll tell you specifically what, if anything, will be allowed in that regard.

With regard to showing the jury this Affiliation Agreement, you asked to make a copy of it and pass it out to each member of the jury, and I said no. I'm not going to tell you what's a better way to try to do that. That's not my role here. So the answer to that is no."

Eventually, defendants' counsel raised the possibility of simply stipulating to the foundation of the affiliation agreement, thereby obviating the need to read deposition excerpts to establish its foundation. The trial court told the parties to discuss that possibility. The trial court reiterated that stipulating to the foundation meant the agreement would be admitted, but "how and whether it is permitted to be used for any permissible or relevant purpose is still a question to be determined."

¶ 17     That afternoon, the parties' attorneys informed the trial court that they had reached a stipulation as to the foundation of the affiliation agreement and that therefore the plaintiffs were withdrawing their request to read deposition excerpts at trial. However, the attorneys also informed the trial court that the stipulation was not to the admissibility of the affiliation agreement (due to the defendants' objections as to its relevance), and therefore the plaintiffs' amended motion to admit "stands to as to the affiliation agreement itself."

¶ 18     After this time, the plaintiffs' put on the remainder of their case-in-chief over approximately one and a half trial days. Immediately prior to resting, the plaintiffs read a stipulation to the jury that stated, "The parties stipulate that the Affiliation Agreement between Northwestern Memorial Corporation and Erie Family Health Center dated April 17, 1998, is authentic and is a business

record." The transcript reveals no request thereafter by the plaintiffs to admit the affiliation agreement into evidence or attempt to use it in any way for the remainder of the trial.

¶ 19    With respect to the trial evidence, the jury heard the testimony of 14 witnesses over the course of 8 days of trial. A detailed recitation of this trial evidence is not necessary to address the issues raised on appeal. However, we summarize the critical testimony presented by both parties below.

¶ 20    The plaintiffs' key expert witness on issues of standard of care and causation was Michael S. Cardwell, M.D., a maternal-fetal medicine physician specializing in high-risk pregnancies. He expressed the opinion that Dr. Grobman violated the standard of care (1) by not identifying Vyse's bicornuate uterus on the 20-week ultrasound examination, (2) by not obtaining a history from Vyse or reviewing any prior ultrasounds taken during Vyse's pregnancy, (3) by not using a technique such as transvaginal ultrasound examination to identify the bicornuate uterus, (4) by not having Vyse return to the maternal-fetal medicine department for follow-up to measure her cervical length at either weekly or bi-weekly intervals until 24 weeks of gestation, and (5) by providing Vyse's healthcare providers at Erie with a report that was incomplete, inasmuch as it failed to state that the images obtained were suboptimal, that the previously seen bicornuate uterus was not identified, or that a transvaginal ultrasound had been performed to verify the bicornuate uterus and to measure the length of the cervix. As to the necessity of a consultation, Dr. Cardwell testified that he interpreted the referral form for the ultrasound (see *supra* ¶ 6) to mean that "the providers at Erie wanted a consultation from maternal-fetal medicine." Such a consultation would include the maternal-fetal medicine physician asking questions of the patient to learn of any prior complications during pregnancy, obtaining any relevant information including prior ultrasounds performed, and making recommendations to the referring providers at Erie.

¶ 21    Dr. Cardwell testified that if weekly or bi-weekly monitoring had occurred and demonstrated

the length of Vyse's cervix to be under 2.5 centimeters, the standard of care called for the physician to recommend that the patient undergo cervical cerclage, in which a suture is placed around the cervix to give it extra strength to maintain the pregnancy within the uterus. When Vyse delivered Hayley prematurely on April 8, 2006, the impression of her treating physicians was that she had cervical insufficiency, which had caused her cervix to dilate prematurely. Having a bicornuate uterus placed Vyse at high risk for such cervical insufficiency. Had a cerclage been performed prior to 24 weeks, Dr. Cardwell's opinion is that Vyse would have carried the pregnancy to near term. His opinion is that Hayley suffered injury as a result of being born pre-term, and that injury would have been avoided if the defendants had complied with the standard of care.

¶ 22    In the defense case, nurse-midwife McKelvey testified that she was aware from the Advocate ultrasound that Vyse had a bicornuate uterus and that she did not consider that finding alone to indicate a high-risk pregnancy. McKelvey testified that when she referred Vyse to Prentice, it was to undergo an "OB ultrasound Level 1, which is a basic fetal survey." It was not for the purpose of a consultation with a maternal-fetal medicine specialist.

¶ 23    Dr. Grobman testified that he was not requested in this instance to perform a maternal-fetal medicine consultation on Vyse. His involvement in Vyse's care occurred because the practice at Prentice is that obstetric and gynecologic ultrasounds are usually read by maternal-fetal medicine physicians, who have the training to interpret them. He was the physician on-call to read ultrasounds on the day Vyse underwent the routine 20-week ultrasound at issue. He described that his role begins after the sonographer obtains the images and discusses with him what was seen; he then reads the films and performs a report. His opinion is that Vyse's ultrasound study was appropriately performed and reported. Her cervix was visualized, and there is no suggestion that it was abnormal. There is no suggestion of a bicornuate uterus, but this is difficult to identify in a

20-week ultrasound. If he had known that a prior ultrasound had shown a bicornuate uterus, the only thing he would have done differently would be to report that the previously diagnosed bicornuate uterus could not be seen on the examination that day. He testified that he complied with the standard of care in reading and reporting the ultrasound. He testified that he had no obligation under the standard of care to be further involved with or direct Vyse's care.

¶ 24        The defense also presented standard of care and causation testimony from maternal-fetal medicine physician Alfred Abuhamad, M.D. He testified that Dr. Grobman complied with the standard of care in connection with Vyse's 20-week ultrasound. He found nothing in his review of materials suggesting a direct or implied request for a maternal-fetal medicine consultation. He testified that the ultrasound study itself was performed in a way that complied with the standard of care. The cervix was appropriately identified, and nothing suggested any cervical abnormality or a need for transvaginal ultrasound. He testified that a bicornuate uterus is almost impossible to detect on a 20-week ultrasound, due to the growth of the baby and size of the uterus by that time. Thus, the fact that it was not detected here is not a violation of the standard of care. He testified that 70-80% of women with a bicornuate uterus will deliver at term, so it is not a finding that requires any special prenatal management in a first pregnancy.

¶ 25        As to causation, Dr. Abuhamad testified that the cause of Vyse's premature delivery of Hayley was premature labor, a condition whereby the uterus goes into contractions prior to term. His basis for this opinion is that when Vyse presented at NMH on April 5, 2006, she was experiencing abdominal pain and cramping, bleeding, and thinning of the cervix. The operative note from the Caesarean section also documented thinning of the lower uterine segment. He testified that these are findings consistent with premature labor and the contractions that occur as part of it, and they are inconsistent with cervical insufficiency. He testified that premature labor is

not preventable, and a cerclage does not prevent it.

¶ 26    At the conclusion of the trial, the jury returned a verdict in favor of both defendants and against the plaintiffs. The trial court entered judgment on the verdict.

¶ 27    The plaintiffs filed a posttrial motion, in which they argued that a new trial was warranted based on the trial court's errors in precluding the plaintiffs from publishing the affiliation agreement to the jury and in barring Hayley from testifying as a witness at trial. The trial court denied that motion in a lengthy written order. In that order, the trial court stated that it had never denied a request to admit the affiliation agreement. It explained that, although the plaintiffs read the stipulation into evidence concerning the document's foundation, the plaintiffs never moved to admit any part of the affiliation agreement into evidence or sought to use it in any way, including during the cross examination of Dr. Abuhamad. Further, none of the plaintiffs' witnesses reviewed the affiliation agreement, relied upon it, or offered any opinion as to its bearing on the standard of care. Additionally, the trial court further set forth a detailed explanation of the reasons why it had granted the defendants' motion to bar Hayley's testimony. This appeal now follows.

¶ 28                                II. ANALYSIS

¶ 29                            A. Affiliation Agreement

¶ 30    The plaintiffs' first argument on appeal is that the trial court erred in denying their "repeated requests" to admit and publish the affiliation agreement between the defendants and Erie. According to the plaintiffs, the trial court erred in conditioning the affiliation agreement's admission into evidence upon its being satisfied as to the procedure by which the plaintiffs would inform the jury of its terms. They cite *Troyan v. Reyes*, 367 Ill. App. 3d 729 (2006), to argue that a business record that is relevant and for which a proper foundation is laid should be admitted into evidence and published to the jury. And they rely on section 2-1107(d) of the Code of Civil

Procedure to argue that, had the affiliation agreement been admitted into evidence, the jury could have read and reviewed it during its deliberations. 735 ILCS 5/2-1107(d) (West 2022) ("Papers read or received in evidence, other than depositions, may be taken by the jury to the jury room for using during the jury's deliberation"). Accordingly, they argue, because the trial court found that the affiliation agreement had some relevance and the parties stipulated to its foundation, the trial court lacked any basis to prevent the jury from seeing the affiliation agreement and the duties that the defendants undertook by entering into it.

¶ 31　　As indicated above, when the trial court denied this aspect of the plaintiffs' posttrial motion, it explained in its written order that it had never ruled on the admission of the affiliation agreement into evidence. Instead, the trial court explained, after the plaintiffs read into evidence the stipulation concerning the foundation of the affiliation agreement, they never sought to do anything with this document. They never sought a ruling on their amended motion to admit it into evidence. Other than their earlier request to provide the jurors with copies of the complete affiliation agreement to read for themselves (which the trial court had denied), the plaintiffs never made any request to publish the affiliation agreement in a way that was more limited to its relevant provisions. And the plaintiffs never made any attempt to use the affiliation agreement with any witnesses during direct or cross-examination.

¶ 32　　Based on our review of the full trial transcript, we agree that the trial court never made the ruling upon which the plaintiffs' primary claim of error is premised. In other words, once the plaintiffs overcame the issue of establishing a foundation for the affiliation agreement, they never thereafter requested the trial court to rule on admitting it into evidence. It is not enough that the plaintiffs had filed a written motion on this issue or that it was the subject of preliminary arguments. They had a duty to obtain a ruling on their motion or to otherwise request to admit the

affiliation agreement into evidence if they wished to raise this claim on appeal, and their failure to obtain such ruling results in forfeiture. *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 41; *Harris Trust & Savings Bank v. Abraham-Zwirn*, 314 Ill. App. 3d 527, 540 (2000); *Village of Robbins v. Village of Midlothian*, 41 Ill. App. 3d 899, 901 (1976) ("It is the duty of the party who seeks to have evidence admitted to obtain a ruling or a refusal to rule and when this is not done no question is before the court of review.").

¶ 33    The plaintiffs argue that the trial court's rejection of their request to provide the jurors with a full unredacted copy of the affiliation agreement to read for themselves was a ruling that effectively denied their request to publish and admit the agreement. Assuming for argument's sake that we accept that this was a ruling sufficient to overcome forfeiture, we nevertheless hold that the trial court ruled correctly on this point. As a decision involving the presentation of evidence to the jury, we review this ruling for abuse of discretion. *Troyan*, 367 Ill. App. 3d at 732. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the trial court's view. *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28.

¶ 34    In this case, we believe that the trial court was well-justified in its concerns about how the plaintiffs intended to use the affiliation agreement at trial and to inform the jury of its terms. From our review of the written materials and oral argument on this topic, it does not appear that plaintiffs' counsel ever intended to use the affiliation agreement in the questioning of a live witness on direct examination. In other words, there was no plan to present witness testimony that would guide the jury's understanding of the affiliation agreement and, more specifically, how its provisions purportedly related to and supported the claim that the defendants should have provided a maternal-fetal medicine consultation to Vyse in this situation. Instead of presenting live

testimony, plaintiffs' counsel's plan was to read discovery deposition excerpts from two of the defendants' corporate representatives as statements of a party-opponent. See Ill. S. Ct. R. 212(a)(2) (eff. Oct. 1, 2020); Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). However, counsel's only expressed purpose in doing so was to lay a foundation to admit this document; the ten discovery deposition excerpts identified in the plaintiffs' amended motion do not pertain to the content or meaning of the affiliation agreement.

¶ 35     It was against this backdrop that the trial court pressed plaintiffs' counsel to be specific and clear about how he was planning to use the affiliation agreement in the plaintiffs' case-in-chief. When plaintiffs' counsel responded by requesting to provide the jury with a full and unredacted copy of the affiliation agreement to read for itself, the trial court responded that the plaintiffs' request was inappropriate and would not be allowed. This ruling was correct. We agree that it would have been highly inappropriate to simply tender the 8-page affiliation agreement to the jury to read for itself and draw conclusions from without any guidance from witness testimony or the trial court about the meaning of these provisions or their relationship to this case.

¶ 36     There are multiple significant problems with the plan proposed by the plaintiffs. First, this is a medical negligence case, not a breach of contract case. In a case for medical negligence, the standard of care is the relevant inquiry by which the defendants' conduct is judged. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). The defendants' duties owed to the plaintiffs and their liabilities do not arise from the terms of a contract. If plaintiffs' counsel simply tendered a full contract to the jury as evidence from which to argue that the defendants' owed duties to Vyse in this case to perform a maternal-fetal medicine consultation, it would pose a substantial risk of confusing these issues as to the nature and source of the defendants' duties and the standard of liability in this case.

¶ 37     Second, even in appropriate cases, the interpretation or legal effect of contract provisions is generally not a determination within the province of the jury. See *Ridenhour v. Mollman Publishing Co.*, 66 Ill. App. 3d 1049, 1051 (1978). The plaintiffs' proposal risked violating this basic legal principle if the jury were permitted to essentially interpret for itself what the affiliation agreement required as to the defendants' provision of a fetal-medicine consultation to Vyse.

¶ 38     Finally, the language of the affiliation agreement alone is far too broad and general to serve as the basis from which the jury could conclude that the defendants were required to provide a maternal-fetal medicine consultation based on Erie's sending of Vyse to Prentice for a 20-week ultrasound. In their appellate brief, the plaintiffs quote the following provisions from the affiliation agreement as those which purportedly support their argument on this point:

"WHEREAS:

* * *

NMC [(Northwestern Medical Corporation)] and [Erie] wish to assume broad-based responsibility for the provision of health care services to the community;

NMC and [Erie] wish to increase access to health care and provide patient outreach and education by providing access to comprehensive health care resources, enhancing teaching opportunities for healthcare [p]roviders and strengthening community collaborations;

* * *

THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

[Erie] will utilize Northwestern Memorial Hospital ('NMH'), a hospital subsidiary with NMC, as a primary site for acute and specialized hospital care for its patient population.

NMC will serve as a referral site to the extent medically appropriate and otherwise acceptable to NMC, will arrange for patients of [Erie], who are in need of more comprehensive health care services than can be provided at [Erie], including inpatient, outpatient and diagnostic services.

* * *

NMC will assure that NMC affiliates shall provide all appropriate and necessary services to patients referred by [Erie] and accepted by NMC, regardless of the patients [sic] ability to pay for hospital charges or the patient's eligibility for any service covered by third [p]arty reimbursement."

Without introducing testimony as to this point, it would not have been appropriate for the plaintiffs to publish these broad contractual provisions to the jury and argue that they supported the specific point that a maternal-fetal consultation was required under the facts of this case. The trial court correctly recognized this, and it properly denied the plaintiffs' request to do so.

¶ 39                     B. Barring Hayley's Testimony

¶ 40      The plaintiffs' second argument on appeal is that the trial court erred in barring Hayley from testifying as a witness at trial. The plaintiffs argue that this ruling by the trial court was both an abuse of discretion and a violation of Hayley's constitutional right to testify in her own case.

¶ 41      The record indicates that when this case was first filed in 2009, Hayley was 3 years old and suffered from several disabilities. As such, the plaintiffs never disclosed pursuant to Supreme Court Rule 213(f)(1) (eff. Jan. 1, 2018) that Hayley would be called at trial as a witness for the plaintiffs. On July 30, 2021, the trial court certified that all discovery was complete. The case eventually received a trial-date of August 11, 2022, by which time Hayley would be 16 years old. In the six months preceding that trial date, defendants' counsel inquired twice about taking

Hayley's discovery deposition under the assumption that given her age, the plaintiffs would call her to testify at trial. The first inquiry was on February 6, 2022, and the second was on June 22, 2022. On June 23, 2022, plaintiffs' counsel responded, "We have not yet decided on whether we will call her to testify. Let's find a date to hold on the calendar, though, for a deposition or a meet and greet." On July 19, 2022, plaintiffs' counsel raised the issue again, proposing only a meet-and-greet for settlement purposes; counsel did not propose a deposition or clarify whether Hayley would be called as a trial witness. The plaintiffs never supplemented their Rule 213(f)(1) disclosures to identify Hayley as a trial witness.

¶ 42    On August 15, 2022, the evening before opening statements, plaintiffs' counsel and defendants' counsel exchanged a series of emails concerning the scheduling of witnesses. At the conclusion of this exchange, plaintiffs' counsel disclosed that he intended to call Hayley as a trial witness on August 23, 2022. The following day, defendants' counsel orally raised the issue with the trial court. This was followed by a written motion to bar Hayley's testimony filed that evening, in which the defendants argued they were prejudiced by the lack of disclosure and the failure to produce Hayley for deposition if they intended to call her at trial.

¶ 43    At argument on the motion, the plaintiffs argued that the defendants had fair notice that Hayley would testify at trial, including from the joint witness list that the defendants prepared and their own disclosure of her as an adverse witness. Plaintiffs' counsel also argued that instead of barring her testimony, the court should consider allowing the defendants to take a deposition of Hayley before she testified. The trial court granted the defendants' motion to bar. In ruling, it stated that the disclosure requirements of Rule 213 are strict, that the plaintiffs had not complied with them in this instance, and that it could not overlook their noncompliance. See Ill. S. Ct. R. 213 (eff. Jan. 1, 2018). The court stated further that the defendants had no burden to take the deposition

of an undisclosed witness, that it was not going to put them in the position of taking a discovery deposition mid-trial, and that they would suffer prejudice if Hayley were allowed to testify without a proper disclosure or a deposition.

¶ 44    The plaintiffs now argue that the above ruling was an abuse of discretion. They argue that despite their nondisclosure, the defendants were long aware that Hayley was likely to be called as a trial witness. They argue that the defendants' knowledge of this is shown by counsel's e-mail of February 6, 2022, stating she assumed the plaintiffs planned to call Hayley as a trial witness given her age; the joint witness list that the defendants drafted, which listed Hayley as a witness; and the defendants' own disclosure of Hayley as an adverse witness. They fault the defendants for failing to send a notice of deposition for Hayley or to respond to plaintiffs' counsel's offer to hold a date for a possible deposition, arguing that this "showed disinterest in a deposition of Hayley, despite knowing she would likely testify." They also fault the defendants for not seeking a recess, continuance, or mistrial to take her deposition. They assert that the trial schedule allowed sufficient time for the defendants to take a discovery deposition prior to Hayley taking the stand.

¶ 45    The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and its ruling will not be disturbed absent an abuse of discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). Rule 213(f) requires that, "[u]pon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial." Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018). For lay witnesses, such as Hayley in this case, Rule 213(f)(1) requires that the disclosing party "must identify the subjects on which the witness will testify." Ill. S. Ct. R. 213(f)(1) (eff. Jan. 1, 2018). Further, Rule 213(i) imposes upon a disclosing party "a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018).

¶ 46        The purpose of the disclosure rules is to allow the opposing party to determine how to prepare for trial and whether to take a deposition of a disclosed witness. *Boyd v. City of Chicago*, 378 Ill. App. 3d 57, 67 (2007). This court has recognized that a party should be allowed to rely on an opponent's answer to Rule 213(f) interrogatories and to expect that only those witnesses disclosed pursuant to that rule will in fact be allowed to testify at trial. *American Service Insurance Co. v. Olszewski*, 324 Ill. App. 3d 743, 748 (2001). This provides litigants with a degree of certainty and predictability in the trial process and prevents trial by "ambush." See *id.* (citing *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 946 (2000)); accord *Jackson v. Mount Pisgah Missionary Baptist Church Deacon Board*, 2016 IL App (1st) 143045, ¶ 63. The disclosure requirements of Rule 213 are mandatory and must be strictly followed, "both by the parties and by the court imposing the rules." *Dalan/Jupiter, Inc. v. Draper & Kramer, Inc.*, 372 Ill. App. 3d 362, 370 (2007); accord *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 38; *American Service Insurance Co.*, 324 Ill. App. 3d at 747-48 (litigants have a right to rely on the fact that courts will enforce the requirements of witness disclosure rules).

¶ 47        In accord with the above principles, we reject the plaintiffs' argument that the trial court abused its discretion when it granted the defendants' motion to bar Hayley from testifying at trial. The plaintiffs unquestionably failed to comply with the requirement of Rule 213(f)(1) that they disclose Hayley's identity as a trial witness and the subject of her testimony if they planned to call her as a witness at trial. This fact alone justifies the trial court's ruling. The defendants were entitled to the disclosure of this information within a sufficient timeframe to decide whether to take her discovery deposition and prepare for trial with adequate knowledge of her testimony. The fact that they may have anticipated that she was someone the plaintiffs might call or that the general topic of her testimony might not be a surprise is not a substitute for a proper disclosure under Rule

213(f)(1). See *American Service Insurance Co.*, 324 Ill. App. 3d at 748 (noting that Rule 213(f) is "not limited to requiring witness disclosure only of those witnesses who may cause unfair surprise").

¶ 48     Notwithstanding the absence of a Rule 213(f)(1) disclosure, the defendants tried twice in the months leading up to trial to clarify whether Hayley would be a trial witness so that her deposition could be taken. However, plaintiffs' counsel never clarified this issue, stating only that as of June 23, 2022, the plaintiffs had not decided whether to call her to testify. Given this response and the absence of a disclosure as of 60 days from trial, we do not fault the defendants for failing to do anything more to press this issue or to obtain Hayley's deposition. See Ill. S. Ct. R. 218(c) (eff. Oct. 1, 2021) (discovery to be completed not later than 60 days before trial).

¶ 49     The plaintiffs also argue that the trial court failed to apply the relevant standard in determining whether Hayley should be allowed to testify notwithstanding the lack of disclosure. According to the plaintiffs, the trial court should have evaluated this issue under the six factors to determine an appropriate discovery sanction: (1) the surprise to the adverse party, (2) the prejudicial effect of the proffered testimony or evidence, (3) the nature of the testimony or evidence, (4) the diligence of the adverse party in seeking discovery, (5) the timeliness of the adverse party's objection to the testimony or evidence, and (6) the good faith of the party offering the testimony or evidence. See *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 124 (1998).

¶ 50     When this argument was raised in the plaintiffs' posttrial motion, the trial court stated in its order that it had evaluated this as an issue involving the failure to comply with the disclosure requirements of Rule 213(f)(1), not as the imposition of a discovery sanction. It did, however, proceed to address these six factors and concluded that they supported its barring of Hayley's testimony. To the extent that the plaintiffs are claiming that the trial court erred in failing to

evaluate this as a discovery sanction, we reject this argument. See *Boyd*, 378 Ill. App. 3d at 68 (recognizing that appellant "mischaracterizes" trial court's decision to disallow testimony by an undisclosed lay witness by treating it as a discovery sanction). Notwithstanding this fact, we recognize also that courts have used these factors to evaluate whether lay witness testimony should be permitted notwithstanding the lack of disclosure. See *e.g.*, *id.* at 68-69; *Jackson*, 2016 IL App (1st) 143045, ¶¶ 62-68.

¶ 51    In this case, we agree that all factors, with the possible exception of factor (3), support the trial court's determination to bar testimony by Hayley at trial. Here, the defendants acted with diligence in e-mailing plaintiffs' counsel twice in the months leading to trial to ascertain whether the plaintiffs intended to present Hayley as a witness, so that her deposition could be taken. By contrast, the plaintiffs failed to act with diligence in providing an answer to this question; only on the night before opening statements did the plaintiffs definitively disclose an intent to call Hayley as a trial witness. Given that the plaintiffs had not responded to the defendants' earlier efforts to ascertain this information in a timely fashion, the defendants were no doubt surprised by the plaintiffs' last-minute disclosure that Hayley would testify. The defendants were also prejudiced by this late disclosure, as the trial had begun, and there was insufficient time to take her discovery deposition, prepare for cross-examination, and make appropriate adjustments to trial strategy. See *Ashford v. Ziemann*, 99 Ill. 2d 353, 370 (1984) (deposition taken shortly before trial testimony does not eliminate surprise or prejudice, as the time factor prevents testimony from being investigated and adjustments in trial strategy being implemented). Also, the defendants raised their objection in a timely manner within one day of the plaintiffs' disclosure of their intent to call Hayley at trial.

¶ 52    As to the plaintiffs' good faith in presenting Hayley's testimony, the trial court stated in its

written order that there was no basis to conclude that the plaintiffs acted with good faith in this instance. It reasoned that even when the plaintiffs had prepared an anticipated schedule of witnesses and produced it to the defendants after the commencement of trial, Hayley was not identified by name in this document, "evidencing a conscious decision by Plaintiffs to continue to conceal their intention to call Hayley." We add also that, from our review of the record, it appears that the plaintiffs' actions in this instance may have been motivated by a desire to have Hayley testify at trial without the burden of producing her for deposition. We concur with the trial court that there does not appear to be good faith in this context.

¶ 53    The only factor which we find somewhat weighing in the plaintiffs' favor is the nature of the testimony itself. As one of the jury's potential tasks in this case involved the assessment of damages, hearing Hayley's own testimony about her life and disabilities could have been helpful to the jury. However, we also believe that there was an element of trial strategy at play on the part of the plaintiffs here as to whether it benefitted their case to present Hayley as a witness. Further, the plaintiffs presented ample testimony and evidence on damages and the extent of Hayley's disabilities, and the jury never reached the issue of damages in any event. Accordingly, the nature of the testimony alone does not weigh in favor of allowing Hayley's testimony despite the nondisclosure.

¶ 54    Finally on the topic of viewing this issue as a discovery sanction, we note that the trial court expressly recognized that it was not under an obligation to bar Hayley's testimony and that it had the discretion to impose a remedy short of completely barring it. The trial court stated, however, that barring her testimony was the only remedy that it deemed appropriate to prevent prejudice to the defendants. In doing so, the trial court stated that the issue of damages would be thoroughly addressed by other properly disclosed witnesses, including Hayley's parents. We find no abuse of

discretion in the trial court's ruling.

¶ 55    The plaintiffs also raise a brief, single-paragraph argument that the trial court should have applied the doctrine of estoppel to prevent the defendants from seeking to bar Hayley's testimony. Their bases for this argument are the defendants' inclusion of Hayley's name on the proposed joint witness list for use during jury selection, the defendants' own disclosure of Hayley as an adverse witness, and the fact that the parties apparently continued to conduct discovery within 60 days of trial. They argue that they justifiably relied on this conduct of defendants. Based on the same reasons discussed above, we reject the plaintiffs' estoppel argument as meritless.

¶ 56    Finally, the plaintiffs argue that the trial court's barring of Hayley's testimony violated her constitutional right to testify in her own case. The plaintiffs cite 11 cases, from Illinois and other jurisdictions, that contain general statements recognizing that parties have a right to testify in civil cases in which they are involved. See *e.g.*, *Dykstra v. A.P. Green Industries, Inc.*, 326 Ill. App. 3d 489, 496 (2001) (in affirming denial of *forum non conveniens* transfer, court stated that a plaintiff exposed to asbestos in Illinois should not be denied access to its courts and "has a right to testify at the trial"); *Figueroa v. Doherty*, 303 Ill. App. 3d 46, 52 (1999) (where referee presiding in claim for unemployment benefits instructed an interpreter to provide only a summary of claimant's testimony instead of translating it word-for-word, this "denied [claimant] the right to testify on his own behalf").

¶ 57    We have reviewed the cases cited by the plaintiffs, and we find that none of them address a party's constitutional rights in the context of a situation analogous to the present case. Specifically, none of the plaintiffs' cases support the proposition that a party's right to testify controls over a complete failure to comply with applicable disclosure rules and an opponent's efforts to ascertain whether such testimony will in fact occur. As discussed above, the rules governing the disclosure

of witnesses and their testimony serve important purposes in facilitating the preparation of a fair trial, and a party's constitutional right to testify is not infringed by a trial court's enforcement of these reasonable procedural rules. See *Bloom v. Guth*, 164 Ill. App. 3d 475, 479 (1987). Accordingly, we reject the plaintiffs' arguments that Hayley's constitutional rights were violated by the trial court's barring of her testimony here.

¶ 58                                   III. CONCLUSION

¶ 59        For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 60        Affirmed.